[No. S089463. Mar. 24, 2008.]

In re DENNIS HAROLD LAWLEY on Habeas Corpus.

[REDACTED]

## COUNSEL

Scott F. Kauffman and Bicka Ann Barlow, under appointments by the Supreme Court, for Petitioner Dennis Harold Lawley.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, David P. Druliner and Robert R. Anderson, Chief Assistant Attorneys General, Mary Jo Graves, Assistant Attorney General, Ward A. Campbell, Stephen G. Herndon, Eric L. Christoffersen, Patrick J. Whalen, Michael P. Farrell and David Andrew Eldridge, Deputy Attorneys General, for Respondent State of California.

## OPINION

**WERDEGAR, J.**—On January 22, 1989, Brian Seabourn shot and killed Kenneth Lawton Stewart. In the years that followed, three men were held criminally accountable for Stewart's death. Petitioner Dennis Harold Lawley was tried, convicted of first degree murder with special circumstances, and sentenced to death for hiring Brian Seabourn and Steven Mendonca to kill Stewart. Seabourn was tried and convicted of second degree murder. (*People v. Seabourn* (Super. Ct. Stanislaus County, 1990, No. 244904).)

Steven Mendonca pleaded guilty to second degree murder for assisting Seabourn. (*People v. Mendonca* (Super. Ct. Stanislaus County, 1990, No. 255043).) We affirmed Lawley's conviction and sentence on automatic appeal. (*People v. Lawley* (2002) 27 Cal.4th 102 [115 Cal.Rptr.2d 614, 38 P.3d 461] (*Lawley*).)

In a petition for writ of habeas corpus, Lawley asserted he was factually innocent of Stewart's murder because Seabourn shot Stewart at the behest of the Aryan Brotherhood, a powerful prison gang, not at his behest. Lawley supported this assertion with, inter alia, a declaration from Seabourn himself asserting that Lawley was not involved in the murder of Stewart. We issued an order to show cause and subsequently appointed a referee to hear evidence and make factual findings. The referee has now issued his report, and the parties have filed briefs on the merits.

The principal question we must answer is this: Has Lawley proven to a sufficient degree of certainty that he was uninvolved in, and innocent of criminal responsibility for, Kenneth Stewart's death? We conclude he has not. Referee Judge John Griffin, after hearing extensive testimony and reviewing written evidence, concluded Seabourn's current testimony was of uncertain credibility and Lawley therefore had failed to show his innocence. Lawley himself does not now assert he was uninvolved in Stewart's death, only that Seabourn would not have killed Stewart "but for" the involvement of the Aryan Brotherhood. We therefore discharge the order to show cause.

FACTUAL AND PROCEDURAL BACKGROUND

*The Crimes and Trial*

The following description of the crimes and trial is taken in large part from our opinion in Lawley's automatic appeal. (*Lawley, supra,* 27 Cal.4th at pp. 113–121.)

On the evening of January 22, 1989, the body of Kenneth Stewart was found on Keyes Road in Stanislaus County, dead of gunshot wounds to the back of the head. Stewart, who had been released from prison four days before his death, had a reputation for robbing drug dealers. In the brief period following his release, Stewart was known to frequent the Del Rio Mobile Home Park in Modesto, also known as Butler's Camp. Lawley rented a cabin at Butler's Camp, and his cabin was the scene of much drug dealing.

Ricky Black, a heroin addict and felon who was also charged with Stewart's kidnapping and murder, as well as an unrelated drug charge, testified under a grant of immunity that on the night of the killing he

encountered Seabourn in Butler's Camp. Seabourn asked him if he had seen Stewart, telling him he wanted to kill Stewart and needed his help. Black agreed; he knew Stewart was in the cabin of Lawrence Woodcock and lured him out by telling him Seabourn wanted to do a drug robbery. After introducing Stewart to Seabourn, Black got into Seabourn's car with Stewart and rode a short distance, but then got out despite Seabourn's entreating him to stay. That was the last time Black saw Stewart. Seabourn later told Black he had killed Stewart and buried the murder weapon. A few days before the murder, Black had entered Lawley's cabin just as Stewart was finishing robbing and assaulting Lawley.

Treva Coonce testified under a grant of immunity at Lawley's preliminary hearing and trial. At the preliminary hearing, Coonce, a heroin addict in jail going through withdrawal and previously a resident of Butler's Camp, testified that a few days after Stewart robbed and assaulted Lawley she heard Lawley say, in the presence of Seabourn, Coonce's boyfriend Steven Mendonca, and others, that he "would do anything to have [Stewart] taken care of" and "would pay to have that [m————r] killed." Seabourn responded that they might "work something out." Coonce saw Lawley give money to Seabourn, perhaps more than $1,000 but less than $5,000. Other business transactions were going on in the cabin at the same time, and Coonce could not say whether the payment was for killing Stewart. On the night of the murder, Coonce was in her trailer at Butler's Camp when Seabourn and Mendonca returned from killing Stewart. Later, Mendonca told her the gun used in the crime had been buried or thrown into water. At Lawley's trial, Coonce repudiated her prior statements and testimony incriminating Lawley and others.

Sharon Tripp testified she stayed at Lawley's cabin off and on in January 1989. One morning that month, she entered the cabin and saw Lawley lying on a couch, with scrapes on his hand and blood on his jacket. Lawley said he had been robbed the night before by Stewart and would "like to kill the [m————r]." He had a gun tucked in his pants.

David Anderson, an ex-heroin addict who had previously served as a police informant, testified he visited Lawley's cabin about six to eight times in January 1989 to purchase drugs. On one occasion, a gun Anderson kept under the front seat of his truck, which was parked near the cabin, was stolen. When he returned to the cabin the following day, Lawley appeared to have been badly beaten. When Anderson asked if he knew who had done it, Lawley did not respond directly to him, but mentioned the name "Stewart." Lawley stated he had things taken care of and that "[i]f the son of a bitch comes back he's a dead [m————r]." While waiting to complete a drug purchase, Anderson saw Lawley, Coonce, and Mendonca enter the bathroom,

leaving the door open an inch and a half. Lawley had Anderson's gun holster down the front of his pants, containing a gun Anderson believed was his. From inside the bathroom, Anderson heard Lawley say: "I got this. I want this done. I got the means to get this done." Lawley also said: "I can give you some tonight, but . . . you won't get the rest until it is done, and I want my property back." Mendonca said: "We know right where he is. I can get the job done." Anderson saw a hand go into a woman's purse and saw an object he believed was his stolen gun. When the three emerged from the bathroom, Coonce was carrying a purse and neither Mendonca nor Lawley had the gun. Mendonca said he wanted some drugs, he was going to take off, it would be fast, and it would be that night. Lawley packaged some cocaine and heroin and gave it to Mendonca and Coonce, telling them: "If you want the rest you have got to get the job done and I want my property back." Coonce and Mendonca then left the cabin.

A search of Lawley's cabin two days after the killing yielded, among other items, a loaded Ruger .357 magnum pistol and unexpended .357 magnum Federal cartridges. California Department of Justice Criminalist Jerry Chisum compared bullet fragments found in, on, or near Stewart's body with bullets fired from the gun found in Lawley's cabin and testified that gun had fired the shot that killed Stewart. Witness Charles Anderson identified the gun as one he had sold to David Anderson a few months before the shooting.

Lawley, who had discharged his appointed attorney and represented himself after a competency hearing in which he was found competent to stand trial, argued to the jury that unidentified persons had framed him for the murder because he had angered them with his efforts to go down in history as "the Beast in Revelations."[1] Lawley also attempted to establish that Seabourn had killed Stewart pursuant to an Aryan Brotherhood contract. At the time of Lawley's trial, Seabourn was unavailable to testify, as he was awaiting his own separate trial in connection with the killing. Accordingly, Lawley made an offer of proof that Monte Mullins and David Hager would testify that Seabourn had told them, inter alia, he had committed the murder at the behest of the Aryan Brotherhood. The prosecutor objected to the proffered testimony on hearsay grounds; Lawley countered that the testimony was admissible under the exception for declarations against penal interest. The trial court ruled that Mullins and Hager could testify that Seabourn had admitted he was hired to kill, and did kill, Stewart, but could not testify that Seabourn identified the Aryan Brotherhood as the party that hired him. Consequently, no testimony regarding the alleged role of the Aryan Brotherhood in the Stewart murder was admitted at Lawley's trial.

---

[1] See Bible, Revelation 13:1 to 13:18, 17:8 to 17:18.

A jury convicted Lawley of single counts of murder (Pen. Code, § 187),[2] conspiracy to commit murder (§ 182, subd. (a)(1)), and solicitation to commit murder (§ 653f, subd. (b)). It found true a financial-gain special-circumstance allegation. (§ 190.2, subd. (a)(1).) It also found true an allegation that Lawley was armed during the commission of a felony. (§ 12022, subd. (a).) The jury subsequently fixed the penalty for the murder and conspiracy counts at death; the trial court imposed sentence accordingly. On automatic appeal, we vacated as unauthorized the special circumstance finding and sentence of death on the conspiracy count, modified the judgment on the conspiracy count, and otherwise affirmed the judgment, including the sentence of death on the murder count. (*Lawley*, *supra*, 27 Cal.4th at p. 113.)

### The Habeas Corpus Proceedings

On June 26, 2000, during the pendency of his automatic appeal, Lawley filed a first petition for writ of habeas corpus challenging his conviction and sentence. The petition asserted Lawley was actually innocent of murder; in support of this claim, it included, inter alia, a declaration by Brian Seabourn describing the circumstances of the killing and asserting that it was the result of an Aryan Brotherhood murder contract. The petition also claimed a violation of due process in the prosecution's failure to disclose material exculpatory evidence consisting of a letter Seabourn had written to the prosecutor after Lawley's trial, allegedly exculpating Lawley; portions of Seabourn's correctional files containing materials generated during his 1997 "debriefing" from the Aryan Brotherhood, in which he likewise allegedly exonerated Lawley; and Seabourn's handwritten account of his participation in the Aryan Brotherhood.

We issued an order to show cause limited to these two claims. In their return, the People, represented by the Attorney General, conceded that Seabourn's statements, if true, would establish Lawley's innocence. Consequently, the Attorney General did not object to an evidentiary hearing; because Seabourn had been awaiting trial at the time of Lawley's trial and had thus been rendered unavailable because of his constitutional privilege not to testify, Lawley had never had a judicial forum in which to proffer such testimony establishing his innocence.

We appointed a referee to hear evidence and answer the following factual questions:

1. Is Lawley factually innocent because Brian Seabourn killed Kenneth Stewart, not at Lawley's request, but solely for or at the direction of the Aryan Brotherhood or other persons?

---

[2] All further statutory references are to the Penal Code.

2. Did Brian Seabourn communicate with District Attorney James C. Brazelton, by letter or other means, after Lawley's trial? If so, what was the substance of the communication?

3. Does the Department of Corrections (now the Department of Corrections and Rehabilitation), or any of its employees, agents, or subordinate or related entities, possess information exonerating Lawley of complicity in the killing of Stewart?

The referee heard testimony from 18 witnesses, including Seabourn. He considered a range of documentary evidence. After taking the matter under submission, the referee concluded (1) Lawley had not demonstrated actual innocence; (2) Seabourn communicated with Brazelton by letter, but only a single line in the letter had any bearing on Lawley's guilt or innocence; and (3) the Department of Corrections had nothing in its possession that would have materially helped Lawley.

The parties have filed postreference briefs. The People take no exception to the referee's report; Lawley disagrees with each of its conclusions. We consider them in turn.

## DISCUSSION

### I. *Lawley's Actual Innocence Claim*

#### A. *Standards for Deciding an Actual Innocence Claim*

 "Habeas corpus will lie to vindicate a claim that newly discovered evidence demonstrates a prisoner is actually innocent." (*In re Hardy* (2007) 41 Cal.4th 977, 1016 [63 Cal.Rptr.3d 845, 163 P.3d 853].) We have long recognized the viability of an actual innocence habeas corpus claim, at least insofar as the claim is based on newly discovered evidence or on proof false evidence was introduced at trial. (*In re Bell* (2007) 42 Cal.4th 630, 637 [67 Cal.Rptr.3d 781, 170 P.3d 153] [false evidence]; *In re Johnson* (1998) 18 Cal.4th 447, 453–454 [75 Cal.Rptr.2d 878, 957 P.2d 299] [both]; *In re Hall* (1981) 30 Cal.3d 408, 415–417, 424 [179 Cal.Rptr. 223, 637 P.2d 690] [both]; *In re Weber* (1974) 11 Cal.3d 703, 724 [114 Cal.Rptr. 429, 523 P.2d 229] [new evidence].) Here, we issued an order to show cause and ordered an evidentiary hearing because Lawley submitted newly discovered evidence, evidence unavailable at the time of trial because of Brian Seabourn's constitutional privilege not to testify, that, if credited, suggested Lawley was factually innocent of the crime for which he had been convicted.

The standard for determining whether to afford prisoners habeas corpus relief on the ground that newly discovered evidence demonstrates actual

innocence is likewise established. Under principles dating back to *In re Lindley* (1947) 29 Cal.2d 709 [177 P.2d 918], "[a] criminal judgment may be collaterally attacked on habeas corpus on the basis of newly discovered evidence if such evidence casts 'fundamental doubt on the accuracy and reliability of the proceedings. At the guilt phase, such evidence, if credited, must undermine the entire prosecution case and point unerringly to innocence or reduced culpability. (*In re Hall*[, *supra*,] 30 Cal.3d [at p.] 417; *In re Weber*[, *supra*,] 11 Cal.3d [at p.] 724.)' (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1246 [275 Cal.Rptr. 729, 800 P.2d 1159].) '[N]ewly discovered evidence does not warrant relief unless it is of such character "as will completely undermine the entire structure of the case upon which the prosecution was based." ' (*In re Weber*, at p. 724, quoting *In re Lindley*[, at p.] 723.)" (*In re Hardy*, *supra*, 41 Cal.4th at p. 1016; accord, *In re Bell*, *supra*, 42 Cal.4th at p. 637; *In re Johnson*, *supra*, 18 Cal.4th at p. 462.) If "a reasonable jury could have rejected" the evidence presented, a petitioner has not satisfied his burden. (*In re Clark* (1993) 5 Cal.4th 750, 798, fn. 33 [21 Cal.Rptr.2d 509, 855 P.2d 729].)

Lawley disputes this standard, arguing that it applies only to the determination whether a petitioner has shown actual innocence for purposes of overcoming procedural bars to habeas corpus relief. He argues that he need only show by a preponderance of the evidence that he is entitled to relief. (E.g., *In re Sassounian* (1995) 9 Cal.4th 535, 546 [37 Cal.Rptr.2d 446, 887 P.2d 527] [habeas corpus petitioner bears the burden of proving facts entitling him to relief by a preponderance of the evidence].)

It is true we referenced the *Lindley* standard for showing actual innocence in *In re Clark*, *supra*, 5 Cal.4th at page 798, footnote 33, a case analyzing when a showing of actual innocence might support an exception to the bar against successive or untimely petitions. In doing so, however, we did not tear the standard from its roots and render it applicable *only* to procedural default cases; instead, both before and after *In re Clark* we have consistently applied it as the relevant standard for deciding substantive actual innocence claims, including twice within just the last year. (See *In re Bell*, *supra*, 42 Cal.4th at p. 637; *In re Hardy*, *supra*, 41 Cal.4th at p. 1016.)

As for Lawley's assertion that a more lenient preponderance of the evidence standard should apply to his claim for relief based on newly discovered evidence, we have always recognized that a higher standard applies to such claims. *In re Lindley* itself involved claims of both perjured testimony and newly discovered evidence establishing innocence. The perjured testimony claim was subject to proof by a preponderance of the evidence: "In a habeas corpus proceeding, one who establishes by a preponderance of substantial, credible evidence that he was convicted by perjured

testimony knowingly presented by representatives of the State, is entitled to a judgment discharging him from custody . . . ." (*In re Lindley, supra*, 29 Cal.2d at p. 722.) The newly discovered evidence claim was subject to the higher standard we have discussed—the evidence must "completely undermine the entire structure of the case upon which the prosecution was based." (*Id.* at p. 723.) Subsequently, we have consistently and consciously applied this higher standard, rather than the preponderance standard, to actual innocence claims. (See, e.g., *In re Hardy, supra*, 41 Cal.4th at pp. 1016–1021 [implicitly applying preponderance standard to ineffective assistance of counsel claim, but applying heightened *Lindley* standard to newly discovered evidence claim]; *In re Johnson, supra*, 18 Cal.4th at pp. 460–462 [acknowledging generally applicable preponderance standard, but applying higher *Lindley* standard to actual innocence claim]; *In re Branch* (1969) 70 Cal.2d 200, 210, 217 [74 Cal.Rptr. 238, 449 P.2d 174] [implicitly applying preponderance standard to ineffective assistance of counsel claim, but applying heightened *Lindley* standard to newly discovered evidence claim]; *In re Imbler* (1963) 60 Cal.2d 554, 560, 569 [35 Cal.Rptr. 293, 387 P.2d 6] [applying preponderance standard to perjured testimony claim and heightened *Lindley* standard to newly discovered evidence claim].)

The rationale for our applying a different, higher standard to actual innocence habeas corpus claims is readily explained. Generally, of course, habeas corpus claims must surmount the presumption of correctness we accord criminal judgments rendered after procedurally fair trials. " 'For purposes of collateral attack, all presumptions favor the truth, accuracy, and fairness of the conviction and sentence; *defendant* thus must undertake the burden of overturning them. Society's interest in the finality of criminal proceedings so demands, and due process is not thereby offended.' " (*People v. Duvall* (1995) 9 Cal.4th 464, 474 [37 Cal.Rptr.2d 259, 886 P.2d 1252], quoting *People v. Gonzalez, supra*, 51 Cal.3d at p. 1260.) Unlike claims directed at prosecutorial, judicial, juror, or defense counsel misconduct, however, actual innocence claims based on either newly discovered or nonperjured false evidence do not attack the procedural fairness of the trial. They *concede* the procedural fairness of the trial, but nevertheless attack the accuracy of the verdict rendered and seek a reexamination of the very question the jury or court has already answered: Is the defendant guilty of the charges presented? A conviction obtained after a constitutionally adequate trial is entitled to great weight. Accordingly, a higher standard properly applies to challenges to a judgment whose procedural fairness is conceded than to one whose procedural fairness is challenged. (See *Strickland v. Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674, 104 S.Ct. 2052] [motions for new trial based on newly discovered evidence are subject to a higher standard than ineffective assistance of counsel claims because they challenge a presumptively fair trial]; *In re Johnson, supra*, 18 Cal.4th at p. 462

[rejecting the assertion that a lower standard should apply to an actual innocence claim in the absence of proof the trial was infected by procedural errors of constitutional dimension].) Metaphorically, an actual innocence claim based on newly discovered evidence seeks a second bite at the apple, but unlike an ineffective assistance of counsel claim, for example, it does not contend the first bite was rotten.

In the alternative, Lawley contends that under the Eighth and Fourteenth Amendments to the United States Constitution he need only show that he "probably is innocent" to obtain relief. (*Herrera v. Collins* (1993) 506 U.S. 390, 442 [122 L.Ed.2d 203, 113 S.Ct. 853] (dis. opn. of Blackmun, J.).) Of course, the majority in *Herrera* rejected that standard, concluding only that *if* the Eighth and Fourteenth Amendments prohibited execution of the innocent—a position it did not endorse—a petitioner would have to, at a minimum, make a "truly persuasive demonstration of 'actual innocence' " and the threshold for relief would "necessarily be extraordinarily high." (*Herrera v. Collins*, at p. 417; accord, *House v. Bell* (2006) 547 U.S. 518, 554 [165 L.Ed.2d 1, 126 S.Ct. 2064].) Nor have we ever concluded the Eighth and Fourteenth Amendments compel a standard lower than the *Lindley* standard. We decline to do so here.

In assessing whether Lawley has satisfied the high standard for actual innocence claims, we do not consider the question de novo; instead, we view it through the lens of the referee's report and findings. "[W]e give great weight to those of the referee's findings that are supported by substantial evidence. [Citations.] This is especially true for findings involving credibility determinations. The central reason for referring a habeas corpus claim for an evidentiary hearing is to obtain credibility determinations [citation]; consequently, we give special deference to the referee on factual questions 'requiring resolution of testimonial conflicts and assessment of witnesses' credibility, because the referee has the opportunity to observe the witnesses' demeanor and manner of testifying' [citation]." (*In re Thomas* (2006) 37 Cal.4th 1249, 1256 [39 Cal.Rptr.3d 845, 129 P.3d 49].) Where, as here, "[t]he referee's finding on petitioner's claim of actual innocence was wholly dependent on his assessment of the credibility of the witnesses before him, a quintessentially factual inquiry," we employ the deferential standard of review applicable to findings of fact to that conclusion. (*In re Johnson, supra,* 18 Cal.4th at p. 461.)

B. *Lawley's Showing of Actual Innocence*

After considering the evidence presented, the referee concluded Lawley had not established his actual innocence. The referee's conclusion is supported by substantial evidence.

Brian Seabourn's testimony was the centerpiece of the evidentiary hearing. Seabourn testified repeatedly that he killed Stewart on orders he received from the Aryan Brotherhood while in prison in 1987 or 1988, and Lawley was innocent and had nothing to do with the crime. As early as 1989, Seabourn had told others, including David Hager and Monte Mullins, that the Aryan Brotherhood was behind the shooting and Lawley was innocent. Seabourn had for a decade maintained Lawley's innocence in letters to Lawley's counsel.

Other witnesses, former Aryan Brotherhood members—Wayne "Smiley" Richardson, David Hager, Jesse Brun—likewise testified the Aryan Brotherhood had ordered Stewart killed.[3] Richardson testified he told Seabourn: "If you get the opportunity when you are out there, take care of business"—i.e., kill Stewart. Hager and Lee Max Barnett both testified that Seabourn told them in the late 1980's or early 1990's that he killed Stewart on behalf of the Aryan Brotherhood. The referee acknowledged there was "plenty of evidence that the AB[4] might have been involved in the murder of Kenny Stewart." A reasonable jury might have credited this testimony.

██ However, a reasonable jury might also have disbelieved Seabourn and the former Aryan Brotherhood members supporting him and instead credited the numerous witnesses at Lawley's original trial who testified that Lawley had a grudge against Stewart, wanted him dead, and paid to have him killed. Alternatively, it might have believed Seabourn and the other witnesses concerning Aryan Brotherhood involvement, but still believed Lawley was also involved and culpable.

Notably, Seabourn has an established history of lying under oath, of lying about this case, and of lying in order to implicate others and exonerate Lawley. At the time of the murder, Seabourn told Steven Mendonca to make up stories about how the Stewart killing had occurred, i.e., lie about how it happened, to confuse those investigating it. Seabourn took the stand and lied at his own trial for the Stewart murder, as he did at other trials. At his sentencing, he concocted a phony "kite,"[5] purported to be from an unknown fellow prisoner named "Ron," that fingered David Hager as the one responsible for the Stewart killing. The fake kite claimed Hager was trying to set up Lawley and Seabourn.

---

[3] Hager's statements do not entirely benefit Lawley. Speaking with investigators for the People, Hager indicated Seabourn got the murder weapon from Lawley, just as he had testified at Seabourn's 1990 trial. At the evidentiary hearing, he initially affirmed but later sought to repudiate these prior statements.

[4] "AB" refers to the Aryan Brotherhood.

[5] Kites are written messages prisoners pass to each other. (See *People v. Elguera* (1992) 8 Cal.App.4th 1214, 1217 [10 Cal.Rptr.2d 910].)

At the evidentiary hearing, Seabourn admitted lying to David Hager about how he killed Stewart. He asserted he would lie under oath to get a man he deemed innocent, Lawley, out of jail. As the referee noted, he maintained his friend Steven Mendonca was entirely innocent as well, despite Mendonca's having pleaded guilty to second degree murder and accepted a sentence of 15 years to life for his role in the murder.

At the evidentiary hearing, Seabourn was also imprecise about the details surrounding the Aryan Brotherhood's order to kill Stewart. Although he testified that he was given an order, he had earlier stated in a declaration that he unilaterally decided to carry out the contract on Stewart to curry favor with the Aryan Brotherhood. He refused to identify anyone who might have been involved in giving the order, making it more difficult to confirm or refute his claim. He testified he had no idea what the basis for the order was, thus contradicting his statement in an earlier declaration that the hit was ordered because Stewart "had 'disrespected' leaders of the AB over an assault of an inmate named Tinker Love."[6] He testified that he was given the order orally, or maybe in writing. He testified that Monte Mullins might have been present when the order was delivered, or perhaps not.[7]

Additionally, an April 1995 letter Seabourn wrote to Lawley's counsel suggests the Aryan Brotherhood conspiracy to kill Stewart may have been an elaborate fiction: "[T]his stuff is real old I got at a few friends who said yes that, that might have been the case that the victim [Stewart] could have been AB or someone who crossed another member like on a hit list something of that nature." He went on: "But I will stay on that issue we discussed about Kenny S. which one would be better if he was an enemy of the AB that would be no problem because people get hit daily for running their mouth about things they shouldn't all over the USA. But to prove he's a member [of the AB] would be hard because everyone knows you have to be around certain people in and out of prison with a lot of support . . . ." One might conclude that Seabourn, in his desire to assist Lawley, chose the easier course of concocting a story that Stewart was an enemy of the Aryan Brotherhood and wound up on their hit list.

In closing, Seabourn offered: "If I can do anything just let me know I know we'll need witnesses and most these people are real shady characters but I'll

---

[6] Seabourn's statement also contradicted other evidence submitted in support of the habeas corpus petition, which alleged the hit was ordered because Stewart "burned" the Aryan Brotherhood by not paying it the "tax" it was due on his drug sales.

[7] While many years have passed since the Stewart murder, one might reasonably suppose that, given this is the very crime for which Seabourn is serving a life sentence, the details might have fixed themselves in his mind. His recollection was certainly clear enough about most other aspects of the crime.

do what I can to get 'em to talk once we know who they are OK"—an offer that makes more sense if Seabourn was planning to find Aryan Brotherhood associates serving life sentences with nothing to lose to testify than it does if the order to kill Stewart was real and the identities of potential witnesses were already fixed. In an addendum, Seabourn added: "I been thinking about how to get those witnesses to testify—this is a suggestion I could write them through you but beings we can't trust these people 100% I'll be careful what I say so they can't hurt us . . . ." He listed people he thought would "come to our side every one except Ricky Black unless he's got life also." He asked for additional research that might help him come up with a motive for why he or the Aryan Brotherhood might have wanted Stewart dead: "[S]o I can check on Stewar[t] situation find out have [your investigator] find out when Kenny S. was in <u>prison</u> and <u>where</u>, as much as you can, because I believe we were in DVI [a Tracy prison] together at the same time and it's possible he made commitments to me and I passed them on as a middle man but cosigned for him and when he got out he didn't follow through. But theirs 100 different things that could of happened."[8]

The letter suggests a motive for constructing such a story, as well. In the course of the letter, Seabourn offered to "do everything possible to help Dennis [Lawley]" and repeatedly expressed his concurrent hope that by doing so, he might get help in seeking a reduced sentence. In a previous meeting, Lawley's counsel had made Seabourn feel like he might have hope of getting out of prison some day. Seabourn repeatedly expressed gratitude for this and other kindnesses counsel had shown him.[9]

A 1995 Seabourn letter to Aryan Brotherhood member Jimmy Pendleton paints a similar picture and creates reason to doubt not only Seabourn but the various former Aryan Brotherhood members who corroborated his story.

---

[8] Seabourn's unusual candor in this letter, one of his first to Lawley's counsel, may be explained by his comment: "I'm <u>pretty sure</u> the mail is 100% safe here I'll always sign my name on the back of the envelope so you'll know if it's been messed with or not." He also marked the letter as "Confidential Legal Mail," a practice he continued throughout their correspondence, although Lawley's counsel did not represent him. In subsequent letters, he became more circumspect.

[9] In another 1995 letter to Lawley's counsel, Seabourn wrote: "I asked you what you were willing to do for me or how far your willing to go for me I think it's best you wait until you get the facts in front of you first and decide the road we're going to go down its just I get over excited I mean all I think about is I might get to get out someday and I hate to loose that feeling But I'm going to try to pretend I'll never get out I know you told me not to get my hopes up but I can't help it I know at the very least I'll get to go out to Court again and that I'll have a little money once in a while regardless what happens." Similarly, in a 1995 letter to Lawley's parents, Seabourn wrote: "But I do need an answer on this, this thing with Dennis [Lawley]. His attorney wrote me I'm sending you the letter with this one let me know what you and Dennis or better yet Dennis's attorney wants me to do how far to go. I know I can get Dennis off but I want to make sure I have his <u>word</u> he'll look out for me."

Seabourn appears to be seeking permission concerning possible future testimony by Aryan Brotherhood members and associates. He then notes Lawley's counsel "went out of his way to help me he has even offered to buy me a T.V. and to help me get an attorney and investigator." He goes on: "Once [Lawley's counsel] decides the best way to go about this I'll let you know what we're going to need and what kind of witnesses it has to be all verified though so the D.A. can't punch holes in our case but that should be no problem once we find out where these rats have done their time and when which jails they were in and so on then we'll be able to find intelligent credible witnesses to support whatever it is we need done." He notes in closing: "Also [Lawley's counsel] says the DA through away everything so I guess we can make up [s—t] because they can't prove it ain't true." Consistent wth their assertion that Richardson, Brun, Hager, and others were untrustworthy, the People pointed out in cross-examination that although each had been debriefed upon leaving the Aryan Brotherhood, a process that involved revealing as much as they knew about Aryan Brotherhood crimes, not one mentioned in debriefing that Stewart was either targeted for murder or had been murdered.

In doubting Seabourn, the referee offered another possible motive. When Seabourn was searched before testifying at the evidentiary hearing, a handcuff key was found hidden in his rectum. In assessing Seabourn's credibility, the referee considered as a possible motivation for testifying that Seabourn might have hoped to use the opportunity of his transport from an out-of-state prison to and from the evidentiary hearing to attempt escape.

Finally, as the referee also noted, Seabourn testified that he had buried the murder weapon, but a ballistics expert at trial testified that a gun found in a search of Lawley's cabin after the murder (and established by other witnesses to have been David Anderson's gun) matched shell fragments found in, on, or near Stewart's body and was the murder weapon. (*Lawley, supra,* 27 Cal.4th at p. 118.) Another ballistics expert testified at the evidentiary hearing, and he too confirmed this match. Based on the record as it existed at the close of the evidentiary hearing, the referee could take into account that discrepancy.[10]

Given this history, it is difficult to know where the lies end and the truth begins with Seabourn. Seabourn admitted having lied, having directed Mendonca to lie, and having created a phony document implicating an innocent third party, all in order to shield himself and his friends, Mendonca and

---

[10] Long after the close of the evidentiary hearing, Lawley submitted evidence purporting to show a gun had been found in the field where Seabourn claimed he had buried one. However, Lawley submitted no foundation establishing the gun was linked to the Stewart murder. Accordingly, we denied his motion to augment the record and do not consider the matter further in connection with his current petition for writ of habeas corpus.

Lawley, from punishment for Stewart's death. His letters suggest he may have rounded up fellow ex-Aryan Brotherhood friends to help him portray Lawley as innocent. The referee apparently concluded that Seabourn, like the boy who cried wolf, could not be deemed reliable, or at a minimum that a reasonable jury could have rejected Seabourn's testimony that Lawley was uninvolved. That conclusion is entitled to special deference. (See, e.g., *In re Malone* (1996) 12 Cal.4th 935, 946 [50 Cal.Rptr.2d 281, 911 P.2d 468].)

Against the referee's conclusion, Lawley repeatedly argues the People presented no evidence Seabourn killed Stewart at Lawley's instigation. They did not have to; that evidence was presented at *trial*. As in *In re Branch, supra*, 70 Cal.2d at page 217, Seabourn's testimony may point to Lawley's innocence if believed, but there is a substantial question whether it should be believed. Lawley's evidentiary hearing showing presents an alternate theory for why Stewart was killed, but given the doubts surrounding Seabourn's credibility, it is not a theory a reasonable jury would have been compelled to accept. Lawley himself hedges, acknowledging in his brief that "[p]erhaps [he] was involved in some way." Accordingly, Lawley has failed to show entitlement to relief on his claim of actual innocence.

II. *Nondisclosure of Exculpatory Evidence*

As noted, we also issued an order to show cause on Lawley's claim that the prosecution failed to disclose material exculpatory evidence in its possession that supported Lawley's assertion of innocence.

█ Before and during trial, due process requires the prosecution to disclose to the defense evidence that is material and exculpatory. (*Kyles v. Whitley* (1995) 514 U.S. 419, 432–433, 437–438 [131 L.Ed.2d 490, 115 S.Ct. 1555]; *United States v. Bagley* (1985) 473 U.S. 667, 674–678 [87 L.Ed.2d 481, 105 S.Ct. 3375]; *Brady v. Maryland* (1963) 373 U.S. 83, 86–87 [10 L.Ed.2d 215, 83 S.Ct. 1194].) This obligation continues after trial: " '[Even] after a conviction[,] the prosecutor . . . is bound by the ethics of his office to inform the appropriate authority of . . . information that casts doubt upon the correctness of the conviction.' " (*People v. Gonzalez, supra*, 51 Cal.3d at p. 1261, quoting *Imbler v. Pachtman* (1976) 424 U.S. 409, 427, fn. 25 [47 L.Ed.2d 128, 96 S.Ct. 984]; see also Rules Prof. Conduct of State Bar, rule 5-220 [duty not to suppress evidence]; ABA Model Rules Prof. Conduct, rule 3.8 ["The prosecutor in a criminal case shall: [¶] . . . [¶] (d) make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense."].)

In his petition, Lawley contended the prosecution breached this duty by failing to disclose a posttrial 1996 letter from Seabourn to Prosecutor

James C. Brazelton that asserted Lawley's innocence, as well as a Department of Corrections report summarizing Seabourn's 1997 debriefing when he disassociated himself from the Aryan Brotherhood, and Seabourn's handwritten account of his Aryan Brotherhood participation.

In the course of the evidentiary proceeding following our issuance of the order to show cause, the People disclosed to Lawley the 1996 Seabourn-Brazelton letter. It was admitted into evidence at the evidentiary hearing, the referee considered it in reaching his conclusions,[11] and Lawley thus had the full benefit of it in attempting to demonstrate actual innocence. The People also disclosed the Department of Corrections report and Seabourn's written account. Again, the referee considered these documents, and Lawley had their full benefit in arguing his actual innocence.[12] Given the prosecution's disclosure of these materials and Lawley's use of them to argue actual innocence, Lawley has received all the relief on this claim to which he might be entitled.

While not contending the prosecution's nondisclosure of these particular documents alone requires a further remedy, Lawley asserts two other bases for relief. First, he argues some relief is warranted because the Department of Corrections has, he contends, failed to make an exhaustive search of its debriefing files for any documents that might corroborate (1) Seabourn's association with the Aryan Brotherhood, and (2) Lawley's contention that Stewart was targeted for death by the Aryan Brotherhood.

We are not persuaded. No one disputes that Seabourn was associated with the Aryan Brotherhood at one point. As mentioned, the referee noted there was "plenty of evidence that the AB might have been involved in the murder of Kenny Stewart." Lawley called and presented evidence from many of the

---

[11] The referee concluded the letter "contains very little information that is helpful to this referee." Seabourn wrote in part: "I hope you don't allow Dennis Lawley to die. Well, actually he's already dead, mentally. If I could, I'd take his place. I know you don't have much pity for criminals after seeing all the [s—t] you see daily but, I see the same thing and I know if I still have compassion for people you do also. This guy isn't guilty of nothing Jim, except desperately wanting to have friends, no matter what the cost." Otherwise, the referee concluded, the letter contained no relevant information pertaining to Lawley's guilt or innocence. Lawley does not challenge this conclusion, which is supported by our own review of the letter.

[12] As with the 1996 Seabourn-Brazelton letter, the referee found the debriefing documents shed little light on Lawley's claim of innocence. The 1997 Department of Corrections debriefing summary indicates Seabourn refused to discuss the Stewart murder because he was still hoping for a new trial, and the referee concluded nothing in Seabourn's handwritten account indicated Lawley was innocent or otherwise would assist him. Having reviewed the summary and handwritten account, we agree, with one exception. Seabourn's handwritten account does assert: "This D.A. who prosecuted me knows this guy Dennis Lawley is innocent but he sent him to Death Roll [*sic*] anyway." It thus sheds no more light on Stewart's murder than the 1996 Seabourn-Brazelton letter.

witnesses whose written files he now demands—David Hager, Wayne Richardson, Jesse Brun, Lee Max Barnett. Additional cumulative evidence culled from Department of Corrections files would not materially alter the referee's conclusion, supported by substantial evidence, that (1) Seabourn was not wholly credible, and (2) the Aryan Brotherhood's wanting Stewart dead was not inconsistent with Seabourn's taking money from Lawley to kill Stewart.

Second, Lawley argues the prosecution engaged in misconduct by first concealing evidence of Aryan Brotherhood involvement at the time of trial and then arguing to the jury: "Now, nobody else in this case had a reason to kill Kenneth Stewart." We rejected this claim of prosecutorial misconduct in Lawley's direct appeal. (*Lawley, supra,* 27 Cal.4th at p. 156.) It is thus barred as repetitive. (*In re Harris* (1993) 5 Cal.4th 813, 824–829 [21 Cal.Rptr.2d 373, 855 P.2d 391]; *In re Waltreus* (1965) 62 Cal.2d 218, 225 [42 Cal.Rptr. 9, 397 P.2d 1001].) Accordingly, it was not within the scope of our order to show cause or our direction to the referee to take evidence and issue findings.

To the extent Lawley seeks to avoid this bar and have us revisit the issue by suggesting now that the prosecution violated *Brady v. Maryland, supra,* 373 U.S. 83, by failing to disclose evidence of Aryan Brotherhood involvement at the time of trial, he may not do so. Lawley's petition for writ of habeas corpus does not allege there was any such *Brady* violation at trial. As we have explained: "When an order to show cause does issue, it is limited to the claims raised in the petition and the factual bases for those claims alleged in the petition. . . . While the traverse may allege additional facts in support of the claim on which an order to show cause has issued, attempts to introduce additional claims or wholly different factual bases for those claims in a traverse do not expand the scope of the proceeding[,] which is limited to the claims [that] the court initially determined stated a prima facie case for relief." (*In re Clark, supra,* 5 Cal.4th at p. 781, fn. 16.)[13] What Lawley could not do in his 2002 traverse, he cannot do at this even later stage: he cannot through argument in a postreference brief expand his claims beyond those alleged in the petition and made the basis of this court's order to show cause.

### III. *Fairness of the Evidentiary Hearing*

Lawley closes by objecting that he was denied a fair evidentiary hearing. He recounts the People's objections to his issuance of subpoenas duces tecum and the referee's reluctance to compel discovery. He further recounts numerous objections to questions during the evidentiary hearing itself, on hearsay and other grounds.

---

[13] Thus, while Lawley complains about the People's insistence during the evidentiary hearing that *Brady* claims were not at issue, the People were right: they were not.

■ What Lawley fails to do is identify error in any of the referee's rulings. In our order appointing a referee, we directed that "[a]ny requests for discovery in this matter, including but not limited to any motion by petitioner under *Pennsylvania v. Ritchie* (1987) 480 U.S. 39 [94 L.Ed.2d 40, 107 S.Ct. 989], should be addressed to the referee. (See *In re Scott* (2003) 29 Cal.4th 783, 814 [129 Cal.Rptr.2d 605, 61 P.3d 402].)" In so doing, we delegated to the referee our "power and authority to require and compel the attendance of witnesses, by process of subpoena and attachment, and to do and perform all other acts and things necessary to a full and fair hearing and determination of the case" (§ 1484), and in particular the power to ensure orderly discovery in this matter. In contravention of both our order and a subsequent order by the referee, Lawley sought discovery directly from third parties and law enforcement officials. While his attempts at obtaining discovery in this fashion and through the referee were in some cases delayed and in some cases ultimately fruitless, Lawley does not articulate how the referee erred, if at all, in managing discovery in the fashion that he did. The mere fact Lawley may have been delayed in receiving, or even denied, discovery he sought does not alone demonstrate error. There is no federal right, constitutional or otherwise, to discovery in a habeas corpus proceeding. (*Harris v. Nelson* (1969) 394 U.S. 286, 295 [22 L.Ed.2d 281, 89 S.Ct. 1082]; *Herrera v. Collins, supra*, 506 U.S. at p. 444 (dis. opn. of Blackmun, J.) ["A prisoner raising an actual-innocence claim in a federal habeas petition is not entitled to discovery as a matter of right."].) Nor have we recognized any state right to unfettered discovery, instead allowing trial courts and referees to manage discovery on a case-by-case basis. (*In re Scott*, at pp. 813–814; *People v. Gonzalez, supra*, 51 Cal.3d at pp. 1258–1261.)

Similarly, while complaining that numerous objections on hearsay grounds were sustained, Lawley does not expressly contend the referee erred in so ruling. Alternatively, if his recitation of these objections and rulings may be interpreted as asserting error, he does not offer any legal argument for why any of the testimony he sought was *not* inadmissible on hearsay and other grounds.

Lawley has not shown he was denied a fair opportunity at the evidentiary hearing to establish his innocence.

### DISPOSITION

Our order to show cause was limited to a claim of actual innocence and the related claim that the prosecution violated a duty to disclose exculpatory evidence. Lawley has not established entitlement to relief on either claim.

Lawley's other claims and his petition for writ of habeas corpus will be resolved by separate order, as is our practice. (See, e.g., *In re Thomas*, *supra*, 37 Cal.4th at p. 1277.) The order to show cause is discharged.

George, C. J., Kennard, J., Baxter, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Petitioner's petition for a rehearing was denied May 4, 2008.