Filed 3/3/22  Sehmbey v. Superior Court CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| NIRMAL SEHMBEY,<br><br>Petitioner,<br><br>v.<br><br>SUPERIOR COURT OF KERN COUNTY,<br><br>Respondent;<br><br>THE PEOPLE,<br><br>Real Party in Interest. | F079755<br><br>(Kern Super. Ct. No. HC 015370A)<br><br>**OPINION** |

-ooOoo-

Appeal from an order of the Superior Court of Kern County.  Michael E. Dellostritto, Judge.

Charles M. Sevilla for Petitioner.

No appearance for Respondent.

Rob Bonta and Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Eric L. Christoffersen and Sally Espinoza, Deputy Attorneys General, for Real Party in Interest.

-ooOoo-

Defendant seeks postconviction relief from his conviction of conspiracy to commit robbery of Manjit Singh. We conclude the evidence on which he relies was either: not "newly discovered," or not "evidence of actual innocence," or was lacking in credibility. (See Pen. Code, §§ 1473.6–1473.7.)[1] We therefore affirm the trial court's denial of postconviction relief.

## BACKGROUND

Nirmal Sehmbey (defendant) was convicted by a jury of conspiracy to commit robbery (§§ 182, subd. (a)(1), 212.5, subd. (c); count 1) and conspiracy to commit assault with a deadly weapon or by means of force likely to produce great bodily injury (§§ 182, subd. (a)(1), 245, former subd. (a)(1); count 2). He was acquitted of making criminal threats. (§ 422; count 3.) Defendant was sentenced to a total unstayed term of three years in prison and ordered to pay restitution and various fees, fines, and assessments.

In an opinion issued on direct appeal, this court struck defendant's conviction on count 2 (conspiracy) and otherwise affirmed the judgment.[2] Defendant subsequently sought postconviction relief in the superior court, which was denied. Defendant appeals, claiming the court erred in denying postconviction we relief. We affirm.

## I. Trial Evidence[3]

As of February 2011, Dr. Ravinderjit Singh and her husband, Manjit Singh, had been attending temple at the Sikh Temple on P Street in Bakersfield for a number of years.[4] Manjit acted as a secretary of the temple, a volunteer position that was one of respect. When the couple married in 2003, however, many in Ravinderjit's family disapproved of the marriage. Defendant, who was married to Ravinderjit's aunt, was not happy with the

---

[1] All statutory references are to the Penal Code unless otherwise stated.

[2] We grant defendant's unopposed request to take judicial notice of this prior decision.

[3] The factual summary in this section of the opinion is taken almost entirely from our opinion in *People v. Sehmbey* (May 3, 2016, F069142) [nonpub. opn.].

[4] For clarity, we refer to the Singhs by their first names. Undesignated dates in this section of the opinion are to the year 2011.

marriage because he perceived Ravinderjit and Manjit as being unequal. Defendant said Manjit did not know who defendant was and how much power he had, and that the couple could not get married. Although Manjit took the words as a threat, he and Ravinderjit married anyway.

After time passed, everything grew quiet. The Singhs had no relationship with defendant, and he left them alone until the summer of 2010, when Ravinderjit's aunt stayed with the couple for a few days. Defendant, who was angry the couple had allowed his wife to stay at their house when she had been kicked out of her home, made threatening telephone calls to the Singhs and said he was going to "come and get them." Eventually, the aunt returned to defendant.

Around February 1, a third party telephoned Manjit and connected defendant to the call. Defendant stated he was very upset and asked why Manjit had kept defendant's wife at Manjit's house. Defendant said he had power and money and could do horrible things to Manjit, and that Manjit only had two weeks to live. Manjit called the police the next day and made a report because defendant kept calling. Manjit declined to pursue legal action against defendant, however.

On February 20, the Singhs attended temple with their two young children. They arrived between 11:00 a.m. and 11:30 a.m. and parked their vehicle in the parking lot. Manjit was driving; Ravinderjit was sitting in the back seat with the children.

Ravinderjit saw two Hispanic males approaching the car from the back. Neither she nor Manjit had ever seen the men before. Ravinderjit saw small guns in their hands. Manjit got out of the car and went to open the back door for his children, and the men immediately attacked him. A fight ensued. Manjit managed to hold one of them down; this man, who was young, tall, and thin, repeatedly struck Manjit in the nose. The other, who was shorter and chubbier, punched Manjit in the head and back. Ravinderjit got out of the car and tried to help Manjit by hitting the men with a large spoon. Ultimately, the heavier man stopped assaulting Manjit and fled. Manjit held the other man down until the police arrived. Manjit suffered abrasions to his hands and legs, a bloody nose, and a severely injured finger.

Prior to the assault, Manjit was wearing his turban, which he habitually did when attending temple. When he was hit in the head, his turban was removed. After the assault ended and the heavier man fled, the turban was nowhere to be found.[5] Manjit never received it back. The turban had no monetary value but was "the most valuable for a family." In Sikh culture, the turban is worn as a symbol of respect, pride, and dignity. It is invaluable. To lose one's turban is to lose one's respect. A person removing another's turban would be showing great disrespect. As a result of the attack, members of the congregation saw Manjit without his turban.

On March 3, Kern County Sheriff's Detective Brunsell set up a pretext telephone call between Manjit and defendant.[6] In the conversation, defendant said he was not going to cuss at Manjit over the phone, but would meet him face-to-face, and to "get ready." When Manjit called defendant a name and asked what he was going to do, defendant instructed him not to curse at defendant, and said, "You already got the result for cursing." Manjit asked, "What result did I get? What did I get? Your man has been caught." Defendant called Manjit an obscene name, then said, "You got beaten in front of women, in front of all the congregation. In front of children you got beaten." He then asked how much more humiliation Manjit needed. When Manjit said defendant's man had been caught and was in jail, defendant responded that he came out on bail. Manjit asked if defendant got him freed; defendant replied, "What need do I have to get him freed, you sister f[**]ker. Whose ever man he is will get him freed. Why do I need to get him freed?" Manjit said the man was caught and named defendant, whereupon defendant demanded to know who said it. After further insults, defendant said, "Listen to me. I will shove a stick up your ass hard. You stop or else." Manjit asked how defendant would do it. Defendant responded, "I say straighten up. Straighten up. Become a man, you idiot. Sister f[**]ker, you will get killed

---

[5] Ravinderjit told police that during the incident, she saw the heavier man remove the turban from Manjit's head and throw it to the ground.

[6] The call was presented at trial by Satvinder Kaur Franco, a registered interpreter in the Punjabi and Hindi languages. She explained that the two parties spoke over each other. Defendant yelled and seemed agitated.

by my hands." Defendant said he had men who would abduct Manjit from Manjit's house. Manjit called defendant a jackal and suggested his men were also jackals. Defendant responded, "That's why the stick went in your ass." When Manjit asked how it went in, defendant answered, "All that humiliation in front of women, men, the whole congregation, all of Bakersfield. You sister f[**]ker, you should die of shame." Manjit said defendant was the one who was humiliated, because everyone said defendant sent men but could not do anything. Defendant responded that he was a millionaire, and if he wanted to fight with Manjit, defendant would send his army, and they would abduct Manjit and bring him.

After further insults, defendant demanded to know why Manjit had kept defendant's "woman" in Manjit's house and told her to get a divorce. The subject then returned to who had been humiliated. Defendant asked, "How else do you understand humiliation? Got beaten in front of women, in front of the whole congregation." He also said, "Where is your turban? The Mexicans took your turban," and told Manjit to go and get it from "those ruffians." Defendant also said, "Blood was flowing from your mouth. Blood was flowing from your nose," and that "the Mexican" kicked Manjit in the face. He did not answer when Manjit asked how he knew. Defendant told Manjit to get his turban, and then Manjit would be worthy to talk to defendant.

A day or two later, defendant telephoned Manjit again. Defendant told Manjit, "[G]et ready. I'm going to get you." Manjit took this as a death threat. It caused him to be afraid, and he contacted the police.

### Testimony of Jorge Negrete

On February 20, Paul Macias gave Jorge Negrete (Negrete) and Negrete's nephew, Jose Macias, a ride to Bakersfield.[7] Negrete came to Bakersfield to assault someone. He carried out the assault. He did not know his victim. He carried out the assault because he was going to be paid. He received his payment after the assault.

---

[7] Paul Macias and Jose Macias are not related.

At trial, Negrete professed not to remember some parts of the incident. He testified he did not recognize a photograph of Manjit, although the picture "[p]robably" was the man he assaulted. He did not recall how much he was paid for the assault. He denied seeing anyone in the courtroom who paid him for the assault. When shown a photographic lineup by police on August 29, however, he identified a photograph of defendant.[8] In addition, he identified defendant at the preliminary hearing. Defendant was one of the two people with whom Negrete met.[9] Negrete said he testified at the preliminary hearing that he knew defendant as Sayer Singh.

In February, Negrete was living in Van Nuys. He met with defendant down the street from Negrete's house. Defendant was driving a white BMW.[10] Defendant – who had initiated contact with Negrete – asked if Negrete would be willing to go to Bakersfield and scare someone and take that person's turban. Defendant said he would pay Negrete to do it. Although Negrete could not remember the amount he was to be paid, he believed it was $1,000. Defendant was the person with whom Negrete made the deal. Afterward, someone else wearing a turban handed Negrete the money. Defendant was present but remained inside his vehicle.

---

[8] Detective Brunsell conducted this interview with defendant. An audio recording of the interview was played for the jury.

[9] Negrete testified at trial that before he was shown the photo array, he was shown a single photograph of defendant. According to Detective Brunsell, however, he had never shown Negrete a photograph of defendant prior to when he showed him the photographic lineup.

[10] Negrete did not recall subsequently telling police that the license number of defendant's car was 5NXF961. At the preliminary hearing, however, he testified that was the number of the BMW he would see when he met with defendant. At trial, he testified he was being truthful at the preliminary hearing.

Detective Brunsell first interviewed Negrete on June 22, the day Negrete was arrested in connection with this case. Negrete volunteered information about defendant's vehicle. Prior to this time, Brunsell had never seen defendant's vehicle; however, Manjit had told him defendant drove a white BMW, and had given Brunsell the license plate number sometime around February 24. Negrete provided the license plate number, which he said he had memorized because he did not trust defendant. The number Negrete provided was 5NXF961. He said the car was a white 2006 BMW.

6

Negrete was not familiar with Bakersfield but was supposed to go to a temple to commit the assault. When he arrived, everybody was wearing a turban. Negrete knew whom he was supposed to assault, because he first met with someone a couple of houses down from the temple. That person pointed out the intended victim. The person gave Negrete something like a bandana to wear on his head.

The victim had just gotten out of his car when Negrete and Jose Macias walked up. They surrounded him. The victim quickly turned toward Jose, whereupon Negrete rushed him and started hitting him. The victim tackled Jose, who went to the ground. Negrete started kicking the victim and trying to get him off Jose, but other people started coming over and helping to stop the attack. Negrete fled with the victim's turban.

Defendant had told Negrete to scare someone. Negrete took it upon himself to assault the victim. Negrete did not remember defendant telling him to take the turban; Negrete did take it, however, and believed he left the location with it.[11] Negrete threw the turban away, because Jose Macias had been caught at the scene, and Paul Macias had already left town. Negrete got rid of the turban at a little market a couple of blocks from the temple. He took a bus back home. After he was paid for the assault, he paid Paul Macias and Jose Macias, who was out on bail.

Negrete was arrested several months later and brought to Bakersfield, where he spoke with law enforcement officers. He believed he identified the kind of vehicle defendant drove and gave them the license number, although he could not recall with certainty.[12]

At the time he testified, Negrete was in custody in state prison. As of February 2011, he was a heroin addict who used the drug every day, and he also had an alcohol problem. He had previously been in prison for selling cocaine to support his habit, and had been

---

[11] At the preliminary hearing, Negrete testified he came to Bakersfield at defendant's direction to scare the victim and get his turban from him.

[12] The parties stipulated defendant was the registered owner of a 2006 BMW, with California license plate number 5NXF961.

involved, on the street, with a Los Angeles-based Southern Hispanic gang since 1998. He had had a number of run-ins with the law for theft-related crimes, including stealing cars.

Negrete entered into a plea agreement for his role in Manjit's assault. As part of that agreement, he understood he would have to testify against defendant. As part of the case settlement agreement in the present case, Negrete pled to battery causing serious bodily injury – a strike – and understood he would be going to state prison. He did in fact go to state prison. In exchange, he agreed to provide truthful testimony in the prosecution of defendant. He had no other understanding or belief concerning the agreement, although his nephew only getting a year in custody and three years' probation influenced him.

After he committed the assault in Bakersfield, Negrete committed a robbery in Los Angeles County by punching a woman in the face and stealing her purse. He had already gone to prison in the Bakersfield case when he entered into a plea agreement in the robbery case, and he was currently in custody for that robbery. Negrete's Los Angeles County case was not discussed when his plea agreement was negotiated in the Kern County case.

After Negrete's arrest in the present case, he had a conversation with Detective Brunsell. From the beginning, Brunsell tried to induce Negrete to cooperate. Brunsell said Jose Macias was facing over 20 years, and Negrete should cooperate with them because they were after the "big fish." Negrete believed that if he cooperated, it would help his nephew get less time. Negrete's expectation came true. Negrete also expected to get some credit for his Los Angeles County case, but he received "four years consecutive" in that matter. His total sentence in the two cases was five years.[13]

In closing argument, the prosecutor highlighted Negrete's identification of defendant at a photographic lineup, the preliminary hearing, and trial. The prosecutor also referenced the pretext call by asking rhetorically how defendant knew "Mexicans" had committed the

---

[13] Negrete originally was charged with two counts of attempted kidnapping, one count of conspiracy to commit assault with great bodily injury, one count of conspiracy to commit robbery, and two counts of conspiracy to commit kidnapping. Those counts all were dismissed because of the plea agreement.

assault when there was no evidence anyone had previously described the events to defendant.

### *Defense Evidence*

Private Investigator Bruce Groesbeck (Groesbeck) and defense counsel interviewed Negrete on November 7, 2013, at the Los Angeles County Jail. During the interview, defense counsel asked whether Negrete had any expectations or deals regarding his current case. Negrete said he was awaiting sentencing on his Los Angeles County case and expected his sentence in that case would run concurrently to his sentence in his Kern County case. Negrete said this expectation was based on what his public defender told him. Negrete also said he had a cousin with the last name of Macias who was arrested in this case, and he was concerned about him. Negrete said it was his understanding that if he (Negrete) would "take the heat" in the Kern County case, the district attorney would be lenient with Macias.

Negrete talked extensively about his state of mind. He said he had been "loaded" on a daily basis from approximately November 2009 through the day of his arrest in this case. He said he could not recall much about the incident, because it had occurred so long ago, and he was under the influence of drugs when he gave his previous statements. Negrete said that when he was arrested, he was under the influence PCP and had injected heroin about 20 minutes earlier. Negrete said he was unable to make an identification from the first photographic lineup, which he was shown after he had been in custody for six to 10 days. He was shown another six photographs and made a selection, but the detective told him that he had picked the wrong person. As for his identification of the car, Negrete said he could not identify any car's make or year or model. He stated the detective told him what year the BMW was, and Negrete got the license plate number from a photograph the detective showed him.

Negrete said he was paid a couple of days after his involvement in the case. He said defendant was not the man who paid him.[14] Asked why he identified defendant in court, Negrete said he was just trying to "get it over with."[15]

During deliberations, the jury sent a note asking for a transcript of the call between Manjit and defendant or, alternatively, a readback of testimony concerning the call. The note also asked for the date of Negrete's plea deal. Finally, the note asked if "psychological injury" would be considered great bodily injury. In a later note, the jury asked for definitions of battery and assault, and asked if they are synonymous. The latter note also asked if the jury could "use" Negrete's rap sheet as "circumstantial evidence."

## II.   Civil Lawsuit[16]

Manjit and Ravinderjit filed a civil lawsuit against defendant in 2012, alleging he conspired to assault Manjit. That lawsuit is relevant to the present matter because much of the evidence defendant relies upon in his efforts to obtain postconviction relief in criminal court comes from depositions given in Manjit's civil lawsuit. We will therefore summarize some of the deposition testimony from the civil lawsuit.

### Tejpal Singh

Tejpal Singh was deposed on July 13, 2016. Manjit is a friend of Jobanjit Singh who, in turn, is a friend of Tejpal's.

On February 20, 2011, Tejpal was on his way to a different Sikh temple when Jobanjit called him and told him to come to the P Street temple because "something happened." By the time Tejpal arrived, the incident involving Manjit was already over. Jobanjit told Tejpal that a couple people had attacked Manjit, and that one person was in custody, and another had fled.

---

[14] Negrete was not asked if defendant was present when he received the money, or if he had made the deal originally with defendant.

[15] Negrete claimed he did not remember telling Grosebeck certain details like this one.

[16] The aspects of Negrete's civil testimony on which defendant relies is described after this section.

Tejpal asked Manjit what happened. Manjit said that as soon as he parked his car and got out, people attacked him. Manjit had a scratch that was bleeding a "little bit." Manjit was wearing an "orange kind of turban" but it was not on right, as if someone had taken it off and Manjit had put it quickly back on. Tejpal did not see Manjit wearing a patka. A patka is a smaller cloth sometimes worn under a turban.

A few days later, Manjit, Ravinderjit and Jobanjit came to Tejpal's house. "They" told Tejpal that someone had tried to kidnap their children.

Tejpal told Manjit and Ravinderjit that he did not see the person who ran away after assaulting Manjit. Nonetheless, they wanted Tejpal to claim that he did see the person and to help identify him. Manjit and Ravinderjit came to Tejpal's house "[m]ore than three times" asking for Tejpal's help. Manjit also called Tejpal many times asking him to falsely identify the assailant who fled. Jobanjit told Tejpal that if the assailant is not identified, he could return and kidnap Manjit's children. Tejpal agreed to identify the individual to police. Tejpal later "learned" that nobody had tried to kidnap Manjit's children.

Manjit and Jobanjit told Tejpal that defendant had sent the assailants. "They" also described a plan to tell police that somebody took Manjit's turban.

Tejpal went to meet with a detective at the P Street temple twice. Manjit was there as well. Manjit told Tejpal separately to identify photograph number six in the photo lineup.

At a second meeting with the detective, Manjit told Tejpal in Punjabi to select photograph number four in the photo lineup. Tejpal had never seen the individuals before and selected the particular photographs solely based on the information provided by Manjit.[17]

After the assault, Tejpal accompanied Manjit and Jobanjit to Castaic. "They" tried to have another person provide "fake evidence" against defendant. When asked what specific fake evidence they were after, Tejpal testified: "I don't recognize, but they want him to go

_____

[17] In his own deposition, Manjit denied telling Tejpal which photographs to select.

11

against [defendant], to say something to what he may be done wrong in LA or something and what his character." Eventually, the man declined to do so.

Manjit asked Tejpal to testify at trial, but Tejpal said he would "speak the truth in front a judge. I'm not going to lie." Tejpal did not testify at trial.

Tejpal understood that Manjit and Jobanjit were no longer friends because of a dispute involving the sale of a home to Jobanjit.

### Jobanjit

Jobanjit gave a deposition on July 21, 2015.

Jobanjit testified that he filed a lawsuit against Manjit in October or November 2014, several months before his deposition. Jobanjit claimed that Manjit had "forced" him to buy Manjit's house. Jobanjit's credit score was low, and Manjit said it was no problem. Manjit said they did not need to "change the loan right now," which was in Manjit's name. Jobanjit made substantial improvements to the house, made payments for the mortgage, insurance and taxes for five years. Manjit eventually changed his mind and said he did not want to sell the house to Jobanjit. This dispute led to a separate civil lawsuit between Jobanjit and Manjit.

Jobanjit met Manjit because their fathers are best friends. On the day Manjit had been assaulted in early 2011, Manjit called Jobanjit and told him to come to the P Street temple because there had been a "fight." When Jobanjit arrived at the temple, the police were there and had "a Mexican guy" in custody. Manjit was wearing "a little turban on his head" and a larger turban was in the front seat of his car. Jobanjit then testified as follows:

"Q      What color was that turban in the front seat? What color was it?

"A      I forgot. Yellow color. It was, like, a little turban. It was yellow.

"Q      Uh huh. [¶] And he was wearing a smaller turban?

"A      Yeah."

Manjit told Jobanjit to say that he heard the "Mexican guy" say "Sehmbey sent me." Jobanjit knew Manjit and defendant had been engaged in a prior argument so Jobanjit told Manjit: "[N]o problem, man." However, Jobanjit did not even know defendant.

12

Manjit also told Jobanjit that "Mohinder Dhaliwal sen[t] this guy."[18] When Jobanjit later refused to implicate Dhaliwal, Manjit became upset.

Manjit later called Jobanjit several times and told him to say the assailant had said, "Sehmbey sent me over." Jobanjit complied and told law enforcement investigators that he heard Macias say, "Sehmbey sent me." In fact, Jobanjit had not heard Macias say that. Before defendant's trial, Jobanjit told David Zulfa[19] that he did not hear Macias say "Sehmbey sent me."

Manjit and Ravinderjit made up a story that someone tried to kidnap their daughters. Manjit also told Jobanjit that he made up the story about his turban being stolen. Jobanjit also testified that Manjit lied about a finger injury to get out of his work as a nurse.

According to Jobanjit, there were "a lot of people" who Manjit coerced into lying to law enforcement.

Jobanjit "guess[ed]" that he told investigators that Macias had a gun. In actuality, Jobanjit does not "think" Macias had a gun.[20]

Jobanjit said that Manjit was removed from his position as secretary of the Sikh temple because he would offend some people in his comments at temple.

Jobanjit was not called to testify at defendant's trial.

*Mandeep Singh*

Mandeep Singh gave a deposition on September 30, 2015.

On the morning of the assault, Jobanjit called Mandeep and told him something had happened to Manjit at temple. When Mandeep arrived, Manjit had a "small turban" on his head.

---

[18] Dhaliwal is defendant's self-described "best friend."

[19] David Zulfa was the deputy district attorney who tried the criminal case against defendant.

[20] Defendant observes that this contradicts the trial testimony of Manjit and Ravinderjit. However, Jobanjit's testimony on this issue is not evidence that defendant was actually innocent of conspiring to rob Manjit.

13

Two or three days later, Manjit and Mandeep spoke about the incident over the phone. Manjit did not tell Mandeep that anyone had tried to kidnap his children. Mandeep does not remember Manjit ever asking him to say anything to the sheriff's department that made him uncomfortable. Manjit did not ask Mandeep to say he heard the assailant say, "Sehmbey sent me."

Four or five days after the incident, the sheriff's office asked Mandeep to call defendant. Mandeep knew defendant through common friends. On the call, defendant denied involvement in the attack. Someone from the sheriff's office recorded the conversation.

### Mohinder Dhaliwal

Mohinder Dhaliwal gave a deposition on February 27, 2015.

Dhaliwal and Manjit were friends until they had a dispute in temple.

According to Dhaliwal, defendant did not like Ravinderjit. However, defendant never talked about Manjit and when asked about Manjit's marriage, defendant would say, "I don't want to talk about it." Other times, defendant would say, "She can go get married to anybody. I have nothing to do with that." According to Dhaliwal, defendant did not have any objection to Manjit's marriage with Ravinderjit. However, defendant's wife did object to their marriage because of the caste difference and age difference. By six months after the wedding, defendant and his wife were not associated with Manjit and Ravinderjit any longer.

Dhaliwal claimed that he and defendant never spoke of the attack on Manjit. Later, Dhaliwal testified that defendant told him, "I don't know why they are accusing me." Defendant denied involvement in the attack.

### Ravinder Kaur Rai

Ravinder Kaur Rai gave a deposition on February 29, 2016.

Rai was working in the temple kitchen on the day of the assault. Someone told Rai there was a fight in the parking lot. By the time Rai got outside, the police had already arrived. The police did not let anyone get close to the scene. However, Rai could see

14

Manjit from a distance, and he did not have a turban or a patka on his head. She saw that he had an orange turban in his hand. Rai was certain it was a turban in Manjit's hand, not a patka.

### *Gurprinder Kaur*

Gurprinder Kaur gave a deposition on February 25, 2016.

Kaur volunteers at the Sikh temple. On the day of the assault, she saw Manjit and Ravinderjit had "got[ten] ahold" of a man on the ground. Kaur initially testified that Manjit had a turban on as he was holding the man, but at some point, it fell off. She later testified that the turban was already on the ground when she arrived at the scene. Kaur did not remember the color of the turban. Manjit's yellow patka "moved a little bit" but was "still there." Manjit later put his turban back on.

Manjit had a bloody nose, his pants were torn, and he was bleeding form the arms and legs. Manjit went to the hospital after the assault and missed work.

A group of people at the temple helped catch one of the assailants. Kaur helped this group. People from the group asked the assailant, "Who has sent you?" The man responded, "Sammy." He repeated it three times. Ravinderjit said that was her uncle's name.

### *Detective Brunsell*

Detective Brunsell gave a deposition on February 20, 2018.

Brunsell investigated the assault on Manjit. Manjit conveyed to Brunsell that defendant's wife told him that defendant had been involved in the assault. Brunsell did not obtain her statement because he was concerned for her safety, and he knew that any statement would be inadmissible under the marital privilege.

Brunsell had Manjit conduct several "pretext calls" with defendant. The first occurred on March 3 and was transcribed by a certified Punjabi interpreter. No calls other than the March 3rd call were sent to the certified interpreter in Fresno.

After the first pretext call, Brunsell gave Manjit a digital recorder and told him to record any future contact with defendant. Manjit told Brunsell about subsequent recordings,

but Brunsell testified he did not think he ever "actually took those into … custody." Manjit described the subsequent calls to Brunsell as "just more of the same" type of conversation from the March 3 call.

Tejpal identified Negrete as an assailant. Negrete was subsequently arrested and initially cooperated with law enforcement. Brunsell told Negrete that, because of his involvement with the investigation, Brunsell could talk to the district attorney on Negrete's behalf. Negrete did ultimately receive a reduced sentence.

In his first interview with Brunsell, Negrete said defendant drove a 5 series BMW and provided the license plate number. Brunsell was clear that he did not provide the license plate number to Negrete nor would he "ever do something like that."

According to Brunsell's report, Manjit said he had been wearing a white turban on top of an orange turban. Brunsell did not recall whether Manjit said one or both turbans were taken.

When Brunsell obtained the "call data" for defendant and Negrete, he did not have the detailed information identifying cell phone towers.[21] Later, Brunsell said he did not recall whether the data on defendant's phone showed what cell tower he was close to when a call was placed. Brunsell testified, "I think after reviewing some of the report that we had to go back with Mr. Negrete and go through the phone numbers and he identified phone numbers that we would commonly refer to as burner phone numbers that he contacted Mr. Singh on."

### Manjit Singh

The trial court summarized Manjit's testimony as follows.[22]

---

[21] A search warrant dated February 24, 2011, seeking defendant's phone records was attached to defendant's postconviction motion to dismiss. The records sought included "cell site location information from any and all telephones called or being called by each target number." Detective Brunsell's statement of probable cause said the records sought "could also be used to track suspects['] movements before, during, and after a crime."

[22] The following is from the postconviction court's ruling, except that references to "petitioner" have been changed to "defendant."

Defendant is his wife's uncle, and he has known him since 1991, however, has only seen him a couple of times. In the two or three in-person meetings between 1991 and 2000, petitioner never threatened him.

Defendant disapproved of the marriage due to the caste difference. Defendant threatened harm to him over the marriage.

He received threatening phone calls from defendant as a result of allowing defendant's wife to live with them for about seven to 10 days after defendant kicked her out of the house. Defendant was threatening to do horrible things to him and telling him that he (Manjit) only had two weeks to live. After receiving a call at work, he called the police and asked to press charges. He was impeached with the police report, which indicated he did not want to pursue legal action.

He has been wearing a turban since he was five years old due to his Sikh religion. He's required to wear a turban at the temple. The turban is considered a symbol of dignity and respect. He was wearing a light-yellow turban at the time of the incident. His turban went off his head during the attack. He does not know where the turban went and believes somebody took it. In a photo shown to him (defendant's exhibit N), he identified an orange cloth in his lap as a handkerchief. He grabbed the handkerchief so he would not have a bare head.

He did give the detective the license number of defendant's white BMW.

During the investigation, he worked with Detective Brunsell to make pretext phone calls. He did not remember the number of times he called to do a pretext call wherein he received no answer. During the successful pretext call, he was not told to make defendant mad or what to say to defendant by the detective.

He did file a lawsuit against defendant alleging a conspiracy to assault him. He seeks money damages, which include $79,000 for lost wages.

In his deposition in 2017, he denies the claims of those stating he asked them to lie about the incident, as set forth herein below. The remainder of his deposition testimony is

17

consistent with his trial testimony, but for some lapses in his memory. In the deposition, he describes the turban as being cream color and his patka, worn under the turban, as orange.

### *Additional Deposition Testimony*

Manjit also testified that he could not recall any contact he had with defendant from 2003 to 2011. Manjit saw Negrete running away from the scene of the assault with a turban tucked under his left arm.

On the day of the assault, Manjit did not mention to law enforcement that his turban had been stolen. Nor did he relay the assailant's identification of defendant. Manjit testified that while his turban was important, conveying the details concerning his children and his injuries was more urgent.

Manjit testified that he thought there were two pretext calls between him and defendant. The first was more than 10 minutes and the second was "probably" more than 20 minutes. Detective Brunsell was also with Manjit during the second call, which was recorded. Manjit believed he had a transcript for both calls.

Manjit "believe[s]" Mandeep also had a pretext call with defendant.

## III.    Postconviction Criminal Proceedings

On January 9, 2017, defendant filed what he referred to as a petition for writ of habeas corpus (habeas petition). Though framed as a habeas petition, defendant cited extensively to section 1473.7, which concerns motions to vacate a conviction. (See § 1473.7.)

Defendant contended that there was newly discovered evidence of his actual innocence. Specifically, defendant pointed to a declaration Jorge Negrete executed on July 12, 2016, and to his deposition in a civil case on October 20, 2016. He primarily relies on the following claims Negrete made in those two instances:

- Defendant never "spoke to me, hire[d] me, or pay [*sic*] me any money to assault the victim." An individual named Singh told him one of his "buddies" had an issue out of Bakersfield.

18

- Detective Brunsell repeatedly urged Negrete to select defendant in a photographic lineup, but Negrete said, "it's not the same guy." The person who paid Negrete was known as "Singh" and was about 40 years old – much younger than defendant.

- Negrete "only knew of the license plate number because [Detective] Brunsell told him the number."

- Negrete implicated defendant because Detective Brunsell and the district attorney pressured him to cooperate to ensure his own "deal" and his nephew's deal.

On March 27, 2018, defendant filed a motion to dismiss based on alleged loss/destruction of evidence by law enforcement.

In a ruling dated June 8, 2019, the court found that even if law enforcement failed to retain certain evidence, it was not done in bad faith. The court also ruled that much of the evidence relied on by defendant was not "newly discovered." Finally, the court found that "Negrete has no credibility with this court." The court denied defendant's motion and petition for writ of habeas corpus. Defendant appeals.

## DISCUSSION

### I. Defendant Has Not Met the Standard Applicable to Raising Loss/Destruction/Fabrication of Evidence Issues in an Out-of-Custody, Postconviction Motion to Vacate

In his March 27, 2018, motion to dismiss, defendant raised the issue of loss/destruction of evidence. At the outset, we must identify the statutory basis for such a motion, as it will dictate the type of showing defendant was required to make below. Defendant references several potential grounds for postconviction relief, including: sections 1473.6, 1473.7, 1385, and the law governing writs of habeas corpus (see § 1473). As explained below, only section 1473.6 provides even a potential basis for defendant's claims regarding lost/destroyed evidence.

19

First, we consider section 1385. That statute authorizes judges to order an action dismissed "in furtherance of justice." (§ 1385, subd. (a).) However, this provision does not support the type of postconviction relief defendant seeks because it is an "established principle that section 1385 does not authorize dismissals after a judgment has become final, …" (*People v. Wiley* (2019) 36 Cal.App.5th 1063, 1068; see also *People v. Chavez* (2018) 4 Cal.5th 771, 777.)

Next, we note that writs of habeas corpus may be prosecuted on the basis of false evidence. (§ 1473, subd. (b)(1)–(2).) However, such writs may only be prosecuted by persons "unlawfully imprisoned or restrained of their liberty, …" (*Id*., subd. (a).) See *People v. Morales* (2018) 25 Cal.App.5th 502, 511–512.) Defendant is not such a person.[23]

In contrast, section 1473.7 does apply to persons who are "no longer in criminal custody." (§ 1473.7, subd. (a).) However, such a person may file a motion to vacate their conviction or sentence for only three specific reasons:

> "(1) The conviction or sentence is legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence. A finding of legal invalidity may, but need not, include a finding of ineffective assistance of counsel.

> "(2) Newly discovered evidence of actual innocence exists that requires vacation of the conviction or sentence as a matter of law or in the interests of justice.

> "(3) A conviction or sentence was sought, obtained, or imposed on the basis of race, ethnicity, or national origin in violation of subdivision (a) of Section 745."

Loss/destruction of evidence is not an enumerated ground for making an out-of-custody motion to dismiss under section 1473.7. (See § 1473.7, subd. (a).)

---

[23] Because defendant's claims regarding lost/destroyed evidence can only be sought under section 1473.6, and not habeas generally, defendant's reliance on authorities like *California v. Trombetta* (1984) 467 U.S. 479, *Arizona v. Youngblood* (1988) 488 U.S. 51, *People v. Fultz* (2021) 69 Cal.App.5th 395, and *People v. Alvarez* (2014) 229 Cal.App.4th 761, are misguided. Section 1473.6, subdivision (a) sets forth standards that are different than those set forth in "exculpatory evidence" cases.

That leaves only section 1473.6 as a plausible basis for defendant's claims related to lost or destroyed evidence. That statute permits a motion to vacate judgment[24] for the following reasons:

> "(1) Newly discovered evidence of fraud by a government official that completely undermines the prosecution's case, is conclusive, and points unerringly to his or her innocence.

> "(2) Newly discovered evidence that a government official testified falsely at the trial that resulted in the conviction and that the testimony of the government official was substantially probative on the issue of guilt or punishment.

> "(3) Newly discovered evidence of misconduct by a government official committed in the underlying case that resulted in fabrication of evidence that was substantially material and probative on the issue of guilt or punishment. Evidence of misconduct in other cases is not sufficient to warrant relief under this paragraph." (§ 1473.6, subd. (a)(1)–(3).)

Defendant argues that the alleged "destruction" of certain evidence by law enforcement falls under these categories. For the sake of argument, we will assume that destruction of evidence can constitute "fraud" as used in subdivision (a)(1). Because it is the only possible basis for defendant's claims regarding lost/destroyed evidence, we will apply section 1473.6 to those claims.[25]

At this point, it is important to observe that section 1473.6, subdivision (a)(1) sets a very high bar for relief. Indeed, postconviction relief is almost universally difficult to obtain, and for good reason. Society has a legitimate interest in the finality of its criminal judgments. (*In re Martinez* (2017) 3 Cal.5th 1216, 1231.) " 'If a criminal defendant has unsuccessfully tested the state's evidence at trial and appeal and wishes to mount a further, collateral attack, " 'all presumptions favor the truth, accuracy, and fairness of the conviction and sentence; defendant thus must undertake the burden of overturning them. Society's

---

[24] Defendant incorrectly argues that this statute provides for habeas relief, rather than a motion to vacate conviction.

[25] Therefore, we conclude the court had *jurisdiction* to consider the motion pursuant to this statute. However, we also conclude that defendant failed to establish entitlement to relief under the statute.

21

interest in the finality of criminal proceedings so demands[.]' " ' [Citation.]" (*Ibid*, italics removed.)

Here, subdivision (a)(1) lays the difficult burden on defendants to provide "[n]ewly discovered evidence of fraud by a government official that completely undermines the prosecution's case, is conclusive, and points unerringly to his or her innocence." (§ 1473.6, subd. (a)(1).) This provision is not satisfied by new evidence that is merely adverse to the prosecution's case. It must *completely undermine* the prosecution's case by *conclusively* and *unerringly* pointing to defendant's *innocence*.

As described below, defendant's failure to appreciate that section 1473.6 is the only potential ground for relief leads him to argue the wrong standard for proving entitlement to postconviction relief. When the standard set forth in section 1473.6 is applied, defendant's claims clearly lack merit.

### *Mandeep Mann Pretext Call*

For example, defendant argues that the purportedly missing Mandeep Mann pretext call constituted "exculpatory evidence," because defendant denied culpability on the call. Additionally, defendant contends the evidence would have undermined the prosecutor's argument there was no way for defendant to have known about certain details of the assault before his pretext call with Manjit.[26]

However, "exculpatory" is not the appropriate standard for determining whether newly discovered evidence satisfies section 1473.6, subdivision (a)(1). Rather, the statute requires evidence that "completely undermines the prosecution's case, is conclusive, and points unerringly to [defendant's] innocence." (§ 1473.6, subd.(a)(1).)[27] This is a much

---

[26] Defense counsel contended at oral argument that this triggers subdivision (a)(3) of section 1473.6, which deals with the fabrication of evidence. However, this claim does not involve fabrication of evidence. Rather, defendant is asserting that the prosecutor made an improper *argument* in light of law enforcement's purported failure to *retain* evidence. Thus, subdivision (a)(3) is not applicable.

[27] This assumes that failure to retain a pretext call even constitutes "fraud" by a government official under section 1473.6, subdivision (a)(1) – an assumption we highly

higher standard than determining whether the evidence was merely "exculpatory." Consequently, even assuming defendant's characterization of the situation is accurate – that law enforcement failed to retain the pretext call and the pretext call would have shown defendant denying involvement – his claim fails at the outset. Evidence of a defendant's self-interested denial of responsibility for a crime – though marginally "exculpatory" – does not "completely undermine[] the prosecution's case" and it does not conclusively point unerringly to defendant's innocence. Similarly, while the call could have had some utility to the defense as a potential explanation for defendant's purported knowledge of certain details during the pretext call with Manjit, it does not rise to the level of "completely undermining" the prosecution's case.

### *Phone Records*

The same can be said of defendant's claim regarding the purported failure to book into evidence or disclose to the defense, phone records showing "no cellular connection between [defendant] and Negrete." Again, even assuming defendant's characterization of these records and of law enforcement's related conduct (or misconduct) was unassailable, this evidence would still fail to meet the standard of section 1473.6. That defendant and Negrete did not speak on their phones to one another does not conclusively point unerringly to defendant's innocence. The two could have spoken on other phones, could have communicated through intermediaries, or could have communicated by other means.

Defendant speculates that cell site detail in the original records might have shown that he and Negrete were not in physical proximity to one another during the relevant time periods. However, defendant acknowledges that the phone records he provided in the proceedings below did not contain cell site location detail because it was no longer available. It is therefore clear that defendant has not shown that the cell site location detail would have conclusively pointed unerringly to his innocence.

---

doubt. Nonetheless, we will indulge it temporarily to explain why defendant's claim fails regardless.

*Manjit's Pretext Calls*

Defendant's claims regarding recordings of pretext calls between himself and Manjit Singh in March and April fail for similar reasons. Defendant contends law enforcement "discarded" the recordings as "unhelpful." He then contends that evidence that is not helpful to the prosecution is "necessarily helpful to the defense, or at least could be." Even if true, defendant's urged inference that the recordings "could" have been "helpful" is not the same as affirmatively showing the recordings would "completely undermine[]" (§ 1473.7, subd. (a)) the prosecution's case.

In addition, we note that the trial court found that if it were assumed that law enforcement did collect and fail to preserve additional pretext calls between Manjit and defendant, it was not done "in bad faith." The court found it reasonable for Detective Brunsell to accept Manjit's representation that the additional calls had no value. Defendant argues it was not reasonable for Detective Brunsell to rely on Manjit's assertion. However, the ultimate question is not whether Detective Brunsell's failure to preserve the additional pretext calls was reasonable, but whether it was fraudulent. Even assuming, without deciding, that best practices would have counseled to retain the pretext calls, it has not been shown that the failure to do so was "fraud" as referenced in section 1473.6.

## II.     Defendant is not Entitled to Relief Under Section 1473.7

Defendant also seeks postconviction relief on grounds other than lost/destroyed evidence. He contends his conviction must be vacated based on evidence that he is innocent of the crime for which he was convicted.

*Law*

Generally, persons no longer in custody or otherwise legally restrained cannot seek a writ of habeas corpus. (See *People v. Morales* (2018) 25 Cal.App.5th 502, 511–512; see also § 1473, subd. (a) [a person "unlawfully imprisoned or restrained of their liberty … may prosecute a writ of habeas corpus"].) However, in certain circumstances, such persons may bring a postconviction motion to vacate under section 1473.7. (§ 1473.7, subd. (a).)

24

One basis for a motion to vacate under section 1473.7 is found in subdivision (a)(2). A person no longer in criminal custody may move to vacate their conviction or sentence on the grounds that "[n]ewly discovered evidence of actual innocence exists that requires vacation of the conviction or sentence as a matter of law or in the interests of justice." (§ 1473.7, subd. (a)(2).)

The motion must be filed "without undue delay from the date the moving party discovered, or could have discovered with the exercise of due diligence, the evidence that provides a basis for relief." (§ 1473.7, subd. (c).)

The statute does not define "evidence of actual innocence." However, from its use in closely related contexts, it is clear that "evidence of actual innocence" is that which undermines the *entire* prosecution case and points *unerringly* to *innocence*. (*In re Lawley* (2008) 42 Cal.4th 1231, 1239; see also § 1473.6.[28]) If a reasonable jury *could have* rejected the evidence, it does not suffice as newly discovered evidence of actual innocence. (*In re Lawley*, *supra*, 42 Cal.4th at p. 1239.) That is, defendant must show that, in light of all the evidence, *no* reasonable juror would have convicted him.

"Newly discovered" evidence is that which is discovered after trial and could not have been discovered earlier with reasonable diligence. (*People v. Perez* (2020) 47 Cal.App.5th 994, 999.)

It is the defendant's burden to establish grounds for relief under section 1473.7, subdivision (a) by a preponderance of the evidence. (See § 1473.7, subd. (e)(1); *People v. Perez*, *supra*, 47 Cal.App.5th at p. 997.) When a defendant relies on subdivision (a)(2), he or she must prove by a preponderance of the evidence that newly discovered evidence of actual innocence requires vacation of the conviction or sentence as a matter of law or in the interests of justice. (§ 1473.7, subds. (a)(2) & (e)(1).)

---

[28] To the extent defendant suggests the phrase as used in section 1473.7, means something substantially different than other postconviction contexts, we are unpersuaded. Moreover, we see no functional difference between this definition from the standards proposed by defendant.

It is important to note that while preponderance of the evidence is a relatively lower *burden of proof* than other criminal contexts, the *fact to be proven* by such evidence is difficult to establish: that there exists newly discovered evidence of *actual innocence* that *requires* vacation of the conviction or sentence *as a matter of law or in the interests of justice*. In other words, that it is more likely that not that *no* reasonable juror would have convicted in light of the new evidence. Here, the trial court found defendant failed to carry his burden to prove such evidence exists. We agree. As explained, the evidence defendant cites is either not "newly discovered"; or not evidence of "actual innocence" requiring relief "as a matter of law or in the interests of justice"; or both.

### Negrete's Posttrial Evidence

Defendant points to Negrete's posttrial claim that Detective Brunsell urged him to select defendant in a photographic lineup even though it was "not the same guy." This evidence, while exculpatory, is not "newly discovered." The defense investigator testified at trial that Negrete claimed the detective administering the photographic lineup coerced him. Negrete said he had "selected" someone in a photographic lineup, and the detective responded that Negrete had "picked the wrong guy."

Defendant also observes that Negrete claimed he "only knew of the license plate number because [Detective] Brunsell told him the number." Again, this claim was not new. The defense investigator testified at trial that Negrete claimed he recited the license plate number from a photograph the detective had showed him.[29] The defense investigator testified that Negrete said he could not identify any car's make or year or model. Negrete also told the defense investigator that the law enforcement personnel who interviewed him had told him "what the year of the BMW was."

Defendant also points to several instances after trial where Negrete stated defendant was not the man who hired or paid him. However, defendant has not shown that this "evidence" was "newly discovered." To the contrary, Negrete testified to that effect at

---

[29] The reporter's transcript says "defendant" showed him the photograph. Both parties agree this should have said "detective."

defendant's trial.[30] When asked if he saw in the courtroom the person who paid him to commit the assault, Negrete testified, "No." When asked if he had previously identified defendant in a photographic lineup, Negrete testified, "That's not even the guy. He looks a lot different. That's not even him." When asked if defendant was the person who had paid him in Van Nuys, Negrete testified, "It was another guy that I met with in Van Nuys that paid me the money. I had said that." Because this evidence was available and offered at trial, it was not "newly discovered."

Defendant counters that Negrete also offered testimony at the preliminary hearing and at trial implicating defendant as the man who hired him. Defendant acknowledges, "To be sure, Negrete made inconsistent statements, but was always brought around to testify [defendant] was his co-conspirator." Defendant is incorrectly conflating evidence that contradicts trial testimony with evidence that is "newly discovered." It is true that Negrete made some inculpatory statements at the preliminary hearing and at trial, and that those statements are contradicted by his exculpatory posttrial statements. But that is a different issue than whether Negrete's posttrial exculpatory statements were "newly discovered."

A hypothetical will illustrate the distinction. Imagine a witness to a car collision initially testified at trial that a particular traffic light was red when the collision occurred and then later testified in the same trial that the traffic light was, in fact, green when the collision occurred. Then, imagine that after trial, the witness executed a declaration stating the traffic light was red. While the declaration would contradict some of the witness's trial testimony (i.e., the testimony that the light was green), it would still not be considered "newly discovered" evidence because it had already been conveyed by *other* portions of the witness's trial testimony (i.e., the testimony that the light was red). It would not be fruitful to argue that while the testimony was "inconsistent," the witness did eventually "come around to testify" that the traffic light was green. The point is that the witness testified *at one point* that the light was red, and therefore repeating that same claim after trial is not

---

**30** Negrete identified defendant at the preliminary hearing but offered different testimony at trial.

"newly discovered evidence." Similarly, here, the fact that Negrete's posttrial declaration contradicted some of his testimony incriminating defendant does not preclude the finding that the evidence is not "newly discovered." The dispositive point here is not that Negrete may have lied at trial, but rather – as the postconviction court put it – that his purported lies and coerced testimony were discovered prior to the conclusion of trial.

Defendant notes that while Negrete testified at trial that defendant was not the person who paid him, he did testify that defendant was present when he was paid. Negrete also testified that he met with defendant before the incident, and that defendant was the one who arranged for him to go to Bakersfield and commit the "crime." However, while Negrete identified defendant at the preliminary hearing as the second person he met with prior to the assault, at trial he testified that, in fact, defendant "[d]oesn't even look like him." Again, this is a situation where Negrete's incriminating claims *and his statements undermining those claims* were both before the jury.

Moreover, even if it were clear that Negrete offered some incriminating testimony that was undermined for the first time by his postconviction statements (rather than by statements made before or at trial), it would not suffice here. Because while such evidence would arguably be "newly discovered," its lack of credibility prevents it from rising to the level of "evidence of actual innocence … that *requires* vacation of the conviction or sentence *as a matter of law or in the interests of justice*." (§ 1473.7, subd. (a)(2), italics added.) Put another way, if a reasonable jury could have rejected the evidence, it does not suffice as postconviction evidence of actual innocence. (*In re Lawley*, *supra*, 42 Cal.4th at p. 1239.)

Here, the postconviction court found that Negrete's posttrial statements concerning false information purportedly fed by law enforcement were not credible. We find no fault with that credibility determination.[31] Negrete's posttrial statements accuse Detective

---

[31] Defendant agrees that we review factual matters presented under a standard deferential to the lower court. Even if that were not the case, we would independently conclude Negrete's posttrial statements lack credibility.

Brunsell of blatant misconduct during recorded interviews and contradict his prior statements at preliminary hearing. Detective Brunsell emphatically denied the accusation. We also note that Negrete had previously been imprisoned for selling drugs. (See Evid. Code, § 788.) Because we agree that Negrete's posttrial statements are not credible, they are not sufficient to carry defendant's burden on a motion under section 1473.7, subdivision (a)(2).[32]

### *Manjit's Turban*

None of the remaining evidence cited by defendant entitles him to postconviction relief.

Defendant observes that Manjit did not tell law enforcement about the turban on the day of the incident. He points to evidence such as the police report, which does not mention any claim by Manjit that his turban was stolen. Defendant argues that Manjit even admitted on the pretext call that his turban had not been stolen.[33] Again, this information was available before trial and cannot constitute "newly discovered" evidence.

Defendant also points to the civil deposition testimony from several witnesses – including Tejpal, Rai, Jobanjit and Kaur as described above – indicating that Manjit had a turban after the attack. However, defendant has merely established a conflict in the evidence. In contrast to the evidence cited by defendant there is also considerable evidence that Manjit's turban was stolen – not the least of which is Negrete's admission at trial that he indeed took Manjit's turban.[34] In addition, Manjit repeatedly maintained under oath that

---

[32] Defendant's speculation in his briefing that law enforcement could have conveyed information to Negrete secretly during his two months in custody or while Detective Brunsell was alone with Negrete in a car or interrogation room is similarly unpersuasive and lacking in credibility.

[33] Manjit testified at his deposition that he told defendant he had the turban just to get more information out of him.

[34] Defendant points to Negrete's statements during his initial interview with Detective Brunsell and at the preliminary hearing, indicating he did not take Manjit's turban. Again, this is not newly discovered evidence, having arisen before trial.

After trial, Negrete testified in his civil deposition that he was "under the influence" at the time and did not recall whether he took Manjit's turban or not. Later in the

his turban was gone (though he retained his orange patka). Ravinderjit also testified at trial that Manjit's turban was gone, and he never got it back.

Thus, there is no doubt that some testimony from the witnesses in civil depositions taken years after defendant's conviction are contrary to Manjit's claims about the turban. However, as explained above, none of it constitutes newly discovered evidence of "actual innocence that requires vacation of the conviction or sentence as a matter of law or in the interests of justice." (§ 1473.7, subd. (a)(2).)

### Jobanjit's Testimony Regarding Assailant's Statement

Defendant next points to Jobanjit's posttrial testimony that Manjit told him to tell police that an assailant had said, "Sehmbey sent me." But, as defendant acknowledges, the "Sehmbey sent me" statement was not introduced at his trial.

### Jobanjit's Recording of Manjit

In his reply brief, defendant cites to a portion of the police report referencing a video recording Jobanjit made of Manjit speaking to deputies after the incident. Defendant says the video "could have" shed light on whether Manjit had his turban. Such speculation does not suffice to carry defendant's evidentiary burden.

### Manjit's Article

In his civil deposition, Manjit testified that he wrote an "article" in Punjabi. A Punjabi to English translation of the article was used as an exhibit to Manjit's deposition. While Manjit did not accept every word of the translation document, he agreed that the gist

---

deposition, Negrete testified that he did not "think" they took the turban and repeated that he did not "even remember taking the turban." Negrete initially testified he did not recall saying he took the turban at trial because they (prosecution/law enforcement) wanted him to. Negrete then immediately testified that he "believe[d] so because they kept saying about that turban. Turban. Turban. Even the detective, turban. You took that turban with you. You took that turban." This testimony, as a whole, is far from a clear denial of ever taking the turban. Even if it were a clear denial, it would merely establish a conflict with the evidence introduced at trial. Also, as noted herein, the trial court found Negrete lacks credibility – a determination with which we concur. In sum, this testimony is not evidence that defendant was actually innocent, requiring vacation of conviction as a matter of law or in the interests of justice.

of the translation was correct as to the subject-matter of the following excerpt:  "Manjit Singh asked a third question regarding his [the attacker's] relationship with the person who had sent him.  The attacker began to reveal his illicit relationship with the daughter of the man who sent him but the women gathered in the crowd started to beat him leaving his response incomplete."

Manjit testified in his deposition that this portion of the article he wrote was not true.  However, Manjit explained that his articles contained both fiction and nonfiction elements.

Defendant says this testimony establishes Manjit's "lying character."  Even if we disregarded Manjit's claim that his articles were not purely works of nonfiction, defendant's claim fails because he did not raise it below.  (See *People v. McCullough* (2013) 56 Cal.4th 589, 593 [rights of criminal defendants can be forfeited by failure to make a timely assertion before a tribunal having jurisdiction to determine it].)

## DISPOSITION

The June 8, 2019 order denying defendant's claims for postconviction relief is affirmed.

POOCHIGIAN, Acting P. J.

WE CONCUR:

FRANSON, J.

SNAUFFER, J.

31