Filed 1/31/25  P. v. Riojas CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>ADAM HECTOR RIOJAS, JR.,<br><br>        Defendant and Appellant. | B336371<br><br>(Los Angeles County<br>Super. Ct. No. BA024452) |

APPEAL from an order of the Superior Court of Los Angeles County, William C. Ryan, Judge.  Affirmed.

Joseph Sobecki for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, Chung L. Mar, Deputy Attorney General, for Plaintiff and Respondent.

_____

Adam Hector Riojas, Jr., filed a motion under Penal Code section 1473.7, subdivision (a)(2),[1] seeking to vacate his murder conviction on the ground of actual innocence. Following an evidentiary hearing at which he was represented by counsel, the trial court denied the motion. On appeal, defendant argues ineffective assistance of counsel for failure to call a witness at the hearing, that the trial court failed to credit the testimony of another witness, and that the trial court improperly excluded hearsay statements tending to implicate defendant's father as the actual killer. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

#### A. The Underlying Crime and Conviction[2]

Following a jury trial, Defendant and Vidal Rodriguez were convicted of second-degree murder of Jose Rodarte on December 8, 1989. A witness testified he saw defendant and another man drive off with Rodarte in defendant's "distinctive beige, striped van." Another witness testified that, later that day, he saw Rodarte and Rodriguez walking away from a body shop near Whittier Boulevard and Townsend Avenue. Two women eating lunch outside a garment business on Townsend Avenue testified they saw defendant's van approach, make a U-turn and park. One of the witnesses identified defendant as the driver of the van, while the other said the driver "resembled" defendant. Shortly after going back inside their workplace, the women heard

---

[1] Further undesignated statutory references are to the Penal Code.

[2] The facts recited here are summarized from the previous opinion of this court affirming Defendant's conviction for murder. (*People v. Riojas* (July 13, 1993, B063404) [nonpub. opn.].)

2

one or three shots fired.  A co-worker, hearing the first shot, looked outside and saw the van and its driver, who she said resembled Defendant.  She heard another shot, and the driver looked toward the back of the van before driving away.  Rodarte lay on the sidewalk where the van had been.  He was transported to a hospital where he was pronounced dead of multiple gunshot wounds.  Before expiring, Rodarte told a witness, in Spanish, that he had been "hit" by two men.

When interviewed by police, both defendant and Rodriguez denied involvement in Rodarte's murder.  Defendant told the police he had spent the night preceding Rodarte's murder with his girlfriend and Rodriguez.  On the day of the murder, defendant said, he had loaned his van to Ruben Garcia, a friend of Rodriguez's whose car was not working.  Rodriguez left with Garcia and returned, alone, in the afternoon.  Rodriguez agreed during his interview that he had spent the night of the seventh at Riojas's apartment, but claimed he spent the following day there as well and had not gone to East Los Angeles.  Rodriguez also claimed that Garcia was a friend of defendants whom he did not know; that Garcia had visited the apartment on the eighth and had appeared angry.

The day after these initial interviews, Rodriguez requested a second interview.  This time he stated that he and Garcia had driven defendant's van to East Los Angeles, where Garcia dropped Rodriguez off for lunch while Garcia checked on his car.  Garcia later returned to pick up Rodriguez and drove to a train station, where the two parted company and Rodriguez drove the van to where defendant and his girlfriend were waiting.

At trial defendant relied on his alibi and challenged the accuracy of the identifications by the prosecution's witnesses.

Defendant was convicted of second degree murder and sentenced to a term of 17 years to life. On appeal, his conviction was affirmed, but his sentence was reduced to 16 years to life. He was released from prison in 2004.

## B. Defendant's Motion to Vacate His Conviction

On January 29, 2020, defendant filed a motion to vacate his conviction on the ground of actual innocence. (§ 1473.7, subd. (a)(2).) Defendant asserted that evidence not presented at his trial would show that his late father, Adam Riojas, Sr.,[3] was Rodarte's actual killer. Defendant insisted that trial witnesses who testified they had seen him driving the van at the scene of Rodarte's murder had actually seen Adam Sr. According to his motion for relief, defendant and his father "bore a striking resemblance to one another, and could be mistaken [for] each other's twin brother." Defendant also alleged that, prior to his death in 2001, his father had told numerous family members and others that he was responsible for Rodarte's murder. Finally, defendant challenged the tactics police had used when interviewing witnesses who placed him in the van at the time of the killing were "unduly suggestive," arguing that "advancements in eyewitness identification research" subsequent to his trial would have resulted in a different outcome had they been available.

In support of his motion defendant attached summaries of witness interviews that a private investigator had prepared in 2002, as well as declarations of some of defendant's relatives.

---

[3]     Many individuals referred to in this opinion are relatives of defendant and share his last name. For ease of reference, and meaning no disrespect, we refer to defendant's relatives by their first names.

4

Carlos, defendant's uncle, told defendant's investigator that, while on his deathbed, Adam Sr. told Carlos and his wife, "I should be in jail, not my son," although he "did not directly confess to the murder." In an unsigned declaration attached to defendant's motion, Carlos stated he and his wife "believed [Adam Sr.] was talking about the murder that [defendant] was convicted of." According to defendant's investigator, Adam Sr. told Gisela, Carlos's wife, "I need to be in jail where my son is because I'm the one who did it." Alicia, defendant's aunt, told the investigator Adam Sr. said "he had killed a man in the Los Angeles area sometime in 1988 or 1989, and that [defendant] was blamed for it or had taken the blame." Defendant's step-sister, Blanca, told the investigator Adam Sr. had telephoned her in 1988 or 1989, while drunk, and said "I just killed a man in Los Angeles." The motion also included the investigator's summary of an interview with Ramiro Ferreira Mancero, a friend of Adam Sr. who worked at a body shop in Tijuana. According to that summary, "[o]n six to ten occasions Ferreira recalls [Adam Sr.] confessing to the murder of a man in the United States" and "[Adam Sr.] felt very bad that his son had taken the blame for the murder that [Adam Sr.] had committed."

After the prosecution filed a written opposition to the motion, the superior court determined that defendant was entitled to an evidentiary hearing to determine whether he was entitled to relief.

### C. The Parties' Motions in Limine

In advance of the evidentiary hearing, both sides filed motions in limine to exclude testimony. In its motion, the prosecution sought an order excluding most of defendant's proffered evidence as hearsay. Defendant's motion sought to

5

prevent trial witnesses from testifying at the evidentiary hearing on the ground their testimony would be duplicative of their trial testimony.  Following oral argument on February 8, 2023, the court took both motions under submission and, on April 3, 2023, issued a written order granting both motions in part.  The trial court ruled that the anticipated testimony of Alicia, Blanca and Mancero was admissible.  The court also ruled that Carlos and Gisela could testify, except that neither could testify to an alleged "deathbed confession" by Adam Sr. or to statements he allegedly made to other family members admitting to the crime.  Finally, the court ruled that the prosecution witnesses' testimony would be limited to "whether Defendant and [Adam Sr.] looked 'strikingly similar' as Defendant claims."

### D. The Hearing and the Order Denying Relief

The evidentiary hearing on defendant's motion began on June 7, 2023 and continued over five additional days until August 10, 2023.  Prior to the hearing defendant filed a witness list that named himself, Blanca, Carlos and Gisela.  Of the four listed witnesses, only Blanca and Gisela testified at the hearing.  Mancero did not testify and was not included on defendant's witness list.

Blanca testified that Adam Sr. told her "he killed someone" and that "he did it and my brother didn't do it."  She also testified that "as long as he lived, [Adam Sr.] always said" that "he was responsible for the murder that [defendant] was convicted of," and described a telephone call from Adam Sr. in December of 1989, when he said "I just finished killing a mother fucker."  Asked whether defendant resembled his father in 1989, Blanca testified, "They look alike" and that people "sometimes" mistook defendant for his father.

6

Gisela testified to a conversation she had with Adam Sr. "When he was in the hospital where he was sick, he mentioned something that he should be in prison. And I ask him, I said, 'why would you say that? Only criminals are in prison.' And he said, 'I should be there. I'm the one who should be there.' But that was it. No confession. No – nothing else." Shown the interview summary prepared by defendant's investigator in 2002, Gisela testified, "[Adam Sr.] didn't say 'I'm the one [who] did it.' He said he's the one that should be in jail, but he never said 'I did it.' " She also corrected a statement attributed to her in a recent declaration, testifying she didn't remember whether Adam Sr. had told her he should be in prison "with" or "instead [of]" defendant. Gisela was not asked any questions on direct about a resemblance between defendant and his father. On cross-examination she was shown a series of photographs, some of which she believed depicted defendant. She did not identify any photograph as depicting Adam Sr.

Rodriguez, who was convicted of Rodarte's murder along with defendant, testified as a prosecution witness under a grant of use immunity. He testified that "Ruben Garcia" was in fact Adam Sr., and had accompanied defendant and Rodriguez in the van en route to East Los Angeles on the day Rodarte was murdered. Rodriguez also testified that defendant had driven the van.

Three other prosecution witnesses testified that defendant and his father did not resemble one another at the time of Rodarte's murder. Yolanda Sanchez, Rodarte's girlfriend at the time of the murder, had seen Adam Sr. "often" prior to the murder, and also knew defendant. According to Ms. Sanchez, defendant and Adam Sr. "didn't look alike. They were different."

7

She testified that in 1989 defendant and his father had "very different" hairstyles, were not the same height, and Adam Sr. looked older than defendant. Maribel Dominski testified that in 1989 she knew both defendant and his father, and could "definitely" tell them apart. She described defendant as "young and handsome" in 1989, while his father had gray hair that he wore "greased back." Sarah Zamora testified that Adam Sr. was shorter and "chunkier" than defendant. The two men had different hair styles. Adam Sr., but not defendant, had gray hair and did not appear to be the same age as defendant.

Following argument by counsel on September 13, 2023, the trial court took the motion under submission, and on November 1, 2023, filed a written memorandum of decision denying defendant's motion. The court rejected the contention "that Riojas, Sr. in fact confessed to the murder and that the confessions are evidence of Defendant's actual innocence." The court found Blanca's testimony "not credible" and gave it "no weight." The court also concluded that Gisela's testimony "never established that Riojas, Sr. in fact confessed to the murder because Riojas, Sr. told Gisela that he should be in prison either with or instead of Defendant," but "never told Gisela that he (Riojas, Sr.) 'did it.' "

Regarding defendant's contention that he was a victim of mistaken identity, the trial court stated it "cannot conclude that Defendant and Riojas, Sr. looked 'strikingly similar' to one another at the time of the commitment offense and were thus mistaken for each other." Based on the witness testimony, the court concluded instead that "Defendant and Riojas, Sr. appeared to look different from each other at the time of the commitment offense."

8

Defendant filed a timely notice of appeal.

## DISCUSSION

Defendant makes three contentions on appeal. First, he argues that motion counsel rendered ineffective assistance by failing to present Mancero's testimony at the evidentiary hearing. Next, he contends that the only possible interpretation of Gisela's testimony was that Adam Sr., not defendant, killed Rodarte. Third, he argues the trial court erred by not admitting Adam Sr.'s alleged "deathbed confession" as a statement against interest under Evidence Code 1230. After reviewing the legal standard applicable to defendant's motion, we will address each of his contentions in turn.

### A. The Legal Standard

Section 1473.7, subdivision (a)(2) provides in pertinent part that "[a] person who is no longer in criminal custody may file a motion to vacate a conviction" on the basis that "[n]ewly discovered evidence of actual innocence exists that requires vacation of the conviction or sentence as a matter of law or in the interests of justice." Section 1473.7, subdivision (e)(1), in turn, provides that "[t]he court shall grant the motion to vacate the conviction . . . if the moving party establishes, by a preponderance of the evidence, the existence of any of the grounds for relief specified in subdivision (a)." Reading these subdivisions together, in order to prevail a defendant must "establish[], by a preponderance of the evidence, the existence of . . . [n]ewly discovered evidence of actual innocence … that requires vacation of the conviction or sentence. . . ." (*Id.* at subds. (a)(2) & (e)(1).) "For purposes of collateral attack, all presumptions favor the truth, accuracy, and fairness of the conviction and sentence; *defendant* thus must undertake the

9

burden of overturning them." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1260.)

Section 1473.7, subdivision (a)(2), does not define "evidence of actual innocence." In related contexts, such as a habeas corpus proceeding under section 1473, evidence of "actual innocence" has been described as evidence which, "if credited, must undermine the entire prosecution case and point unerringly to innocence or reduced culpability" (*In re Lawley* (2008) 42 Cal.4th 1231, 1239) or evidence which " 'will completely undermine the entire structure of the case upon which the prosecution was based.' " (*In re Weber* (1974) 11 Cal.3d 703, 724.) Evidence which "a reasonable jury could have rejected" does not establish actual innocence. (*In re Clark* (1993) 5 Cal.4th 750, 798 & fn. 33.)

These cases were decided long before the Legislature adopted section 1473.7 effective January 1, 2017. "The enacting body is deemed to be aware of existing laws and judicial constructions in effect at the time legislation is enacted." (*People v. Weidert* (1985) 39 Cal.3d 836, 844.) " 'It is a well-recognized rule of construction that after the courts have construed the meaning of any particular word, or expression, and the legislature subsequently undertakes to use these exact words in the same connection, the presumption is almost irresistible that it used them in the precise and technical sense which had been placed upon them by the courts.' " (*In re Friend* (2021) 11 Cal.5th 720, 730.) Thus, we construe the term "evidence of actual innocence" in section 1473.7, subdivision (a)(2), as adopting the test for such evidence used in the cases cited in the preceding paragraph.

## B. Defendant Cannot Show Ineffective Assistance of Counsel

Defendant's first substantive contention is that the attorney representing him at the hearing on his motion rendered ineffective assistance for failing both to include Mancero on his witness list and to call him to testify at the hearing. We reject this contention because defendant has not shown that the failure to present this witness's testimony was the result of any act or omission amounting to ineffective assistance of counsel.

As a preliminary matter, ineffective assistance of counsel is only a ground for relief if defendant had a constitutional right to counsel in connection with a motion under section 1473.7. (*Coleman v. Thompson* (1991) 501 U.S. 722, 754.) Defendant cites *Strickland v. Washington* (1984) 466 U.S. 668, which held that the sixth amendment guarantee of counsel requires competent counsel, but *Strickland* is inapplicable here. The sixth amendment applies only to "criminal prosecutions," U.S. Const., 6th Amend., and "the *Strickland* standard is coterminous with the Sixth Amendment right to counsel." (Note, A Second Chance: The Right to Effective Assistance of Counsel in Immigration Removal Proceedings (2007) 120 Harv. L.Rev. 1544, 1550.) Postconviction relief "is not part of the criminal proceeding itself, and it is in fact considered to be civil in nature," *Pennsylvania v. Finley* (1987) 481 U.S. 551, 557, and defendant "has no federal constitutional right to counsel . . . when attacking a conviction that has long since become final upon exhaustion of the appellate process." (*Id.* at p. 555.) Our Supreme Court, too, has held there is no federal constitutional right to effective assistance of counsel in postconviction proceedings. (*People v. Delgadillo* (2022) 14 Cal.5th 216, 226; *People v. Lewis* (2021) 11 Cal.5th 952, 972.)

"When the state is not constitutionally required to provide counsel, the petitioner must bear the costs of counsel's mistakes because, by definition, the provision of effective assistance of counsel is not constitutionally necessary to render that proceeding fair."  (Note, A Second Chance, *supra,* 120 Harv. L.Rev. at p. 1551.)

In limited circumstances a right to counsel may arise under the due process clause where there is a statutory right to counsel or the potential for " 'a significant deprivation of liberty.' " (*Conservatorship of David L.* (2008) 164 Cal.App.4th 701, 710.) In *People v. Fryhaat* (2019) 35 Cal.App.5th 969, 980-981, an appeal from an order denying relief under subdivision (a)(1) of section 1473.7, the Court of Appeal construed the statute "to provide the right to appointed counsel where an indigent moving party has set forth factual allegations stating a prima facie case for entitlement to relief under the statute" in order to avoid "serious and doubtful questions as to its constitutionality."[4] (*Fryhaat*, at p. 981.)  An indigent defendant in immigration detention and facing deportation is obviously in a different position than defendant, who has been released from prison and is not facing any deprivation of liberty regardless of the outcome of his motion for relief.  Ultimately, however, we need not determine whether due process entitled defendant to effective assistance of counsel at the hearing on his motion to vacate his conviction, because on the record before us defendant has not shown that his counsel at the hearing in the trial court rendered ineffective assistance.

---

[4]     The record shows that defendant was represented below by "private counsel."

12

Here, the record is silent as to why Mancero did not testify. Citing the investigator's report from December of 2002 that Mancero was "willing to cooperate," defendant argues that the failure to include Mancero on the witness list "is circumstantial evidence of the failure to properly investigate and consider Mancero as a witness." We are not persuaded, because a willingness to cooperate in 2002 has no tendency to prove counsel was at fault for not producing Mancero at a hearing in 2023. "If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation." (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.) Here, defendant himself offers a number of possible – and satisfactory – "explanations for why Mancero was left off the witness list. He could have passed away, he could be sick, he could have refused to cooperate."

Defendant can only speculate that trial counsel's ineffectiveness is the reason why Mancero did not testify at the hearing. "[A] mere possibility is nothing more than speculation. Speculation is not substantial evidence." (*People v. Ramon* (2009) 175 Cal.App.4th 843, 851.) Defendant's speculation furnishes no basis for us to reverse the trial court's order denying his motion for relief under section 1473.7. "We cannot evaluate alleged deficiencies in counsel's representation solely on defendant's unsubstantiated speculation.' [Citations.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 334.) It necessarily follows that "a claim of ineffective counsel cannot be established by mere speculation" because "[w]e cannot assume from a silent record that particular

13

witnesses were ready, willing and able to give mitigating testimony." (*People v. Medina* (1995) 11 Cal.4th 694, 773.)

### C. The Trial Court Did Not Abuse its Discretion by Disregarding Gisela's Statement

Defendant next contends the trial court erred when it concluded Gisela's testimony regarding statements made by Adam Sr. did not prove defendant was actually innocent of Rodarte's murder. Both parties assert that we should independently review the trial court's determination that Gisela's testimony did not establish defendant's actual innocence, citing *People v. Vivar* (2021) 11 Cal.5th 510 (*Vivar*). *Vivar* held that independent review was the appropriate standard for a motion for relief under subdivision (a)(1) of section 1473.7, where the moving party is an alien seeking to vacate a conviction on the ground that he did not understand that a guilty or no contest plea would result in his being deported from the United States and excluded from re-entry, citing "the history of section 1473.7, the interests at stake in a section 1473.7 motion, the type of evidence on which a section 1473.7 ruling is likely to be based, and the relative competence of trial courts and appellate courts to assess that evidence." (*Vivar,* at p. 527.)

Our recent cases apply an independent review standard without specifying whether that standard is limited to motions for relief under subdivision (a)(1), or to all motions for relief under section 1473.7. (See, e.g., *People v. Singh* (2022) 81 Cal.App.5th 147, 154 ["We exercise our independent judgment in reviewing appeals from section 1473.7 hearings."] However, we need not resolve the question whether independent review is limited to motions under subdivision (a)(1) here. Even under independent review, appellate courts "must give deference to the

trial court's factual determinations if they are based on ' " 'the credibility of witnesses the [superior court] heard and observed.' " ' " (*People v. Espinoza* (2023) 14 Cal.5th 311, 320; *Vivar, supra*, 11 Cal.5th at pp. 527-528 ["In section 1473.7 proceedings, appellate courts should . . . give particular deference to factual findings based on the trial court's personal observations of witnesses"].)  The trial court's determination of the weight to afford Gisela's testimony was based on personal observation of that testimony at the hearing on defendant's motion.  We will apply independent review to the trial court's assessment of Gisela's testimony, affording its determination the "particular deference" called for by *Vivar*.

According to Gisela, Adam Sr. never explicitly confessed to Rodarte's murder, but said he should be in jail "with" his son. Defendant argues this testimony permitted the court to reach no other conclusion than that Adam Sr. was the actual murderer of Rodarte.  We disagree.  The record shows many reasons, none of which point to defendant's actual innocence, why Adam Sr. might have believed he should be in jail.  For example, according to Gisela, Adam Sr. was involved in drug trafficking and human smuggling, crimes that could result in a prison sentence. Rodriguez's testimony places Adam Sr. in defendant's van on the day Rodarte was killed, meaning Adam Sr. may have believed he was guilty of Rodarte's murder – along with defendant – based on a lay understanding of California's felony-murder rule in effect in 1989.  Rodriguez implicated Adam Sr. in drug transactions along with defendant.  Adam Sr. might have believed he should be jailed for suborning defendant and Rodriguez to lie about "Ruben Garcia" being in the van on the day of the murder.  Finally, Adam Sr. might have believed he should be jailed in connection with the

murder of someone other than Rodarte.[5]  For all of these reasons, the statements made to Gisela by Adam Sr. are not evidence of actual innocence because they did not "undermine the entire prosecution case and point unerringly to innocence or reduced culpability," (*In re Lawley, supra,* 42 Cal.4th at p. 1239) nor " 'completely undermine the entire structure of the case upon which the prosecution was based.' " (*In re Weber, supra,* 11 Cal.3d at p. 724.)

### D. The Trial Court Did Not Abuse Its Discretion by Excluding Adam Sr.'s "Confession."

Defendant's final contention is that the trial court erroneously refused to admit Adam Sr.'s alleged deathbed "confession" as a declaration against interest under Evidence Code section 1230.  Section 1230 states that "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true."

---

[5]     Adam Sr. told his sister Alicia he had kidnapped someone from a restaurant in Los Angeles, shot the victim with a rifle and dumped his body in a remote location.  Indications in the record are that Rodarte was picked up from his house, shot with a .38 caliber handgun and left to die on a sidewalk in East Los Angeles.

To satisfy the exception, the proponent " 'must show "that the declarant is unavailable, that the declaration was against the declarant's penal [or other] interest, and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." ' " (*People v. Geier* (2007) 41 Cal.4th 555, 584.)  It is defendant's burden to establish the foundational facts to admit the proffered statements under Evidence Code section 1230. (*People v. Lucas* (1995) 12 Cal.4th 415, 462.)  "We review a trial court's decision whether a statement is admissible under Evidence Code section 1230 for abuse of discretion."  (*People v. McDaniel* (2021) 12 Cal.5th 97, 132; *People v. Chhoun* (2021) 11 Cal.5th 1, 47 [same].)  Its decision will not be disturbed on appeal " 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Brown* (2003) 31 Cal.4th 518, 534.)

The focus of the declaration against interest exception is "the basic trustworthiness of the declaration."  (*People v. Frierson* (1991) 53 Cal.3d 730, 745.)  The presumption of trustworthiness "arises from the belief that a reasonable person ordinarily will not make an inaccurate statement that jeopardizes a personal interest." (Note, Declarations Against Penal Interest:  Standards of Admissibility Under an Emerging Majority Rule (1976) 56 B.U. L. Rev. 148, 154.)  For this reason, "the fundamental requirement of a declaration against interest [is] that the declarant actually believes himself to be at some significant risk of civil or criminal liability when he makes the statement sought to be admitted."  (*Clark v. Optical Coating Laboratory, Inc.* (2008) 165 Cal.App.4th 150, 171.)

Here, the record shows many reasons why the trial court could properly exercise its discretion to determine Adam Sr.'s alleged confession was not admissible as a declaration against interest under Evidence Code section 1230.  The trial court alluded to some of those reasons in its order.  The statements attributed to Adam Sr. were made in anticipation of death,[6] meaning he could not have reasonably anticipated his statement would subject him to criminal or civil liability.  "The court could well conclude these potential consequences were too speculative or remote to impinge on penal interest for purposes of Evidence Code section 1230."  (*People v. Chhoun, supra,* 11 Cal.5th at p. 48.)  As for the effect of this "confession" on his reputation, Adam Sr. "was universally known as a violent drug dealer, drug user, alien smuggler, and alcoholic to his family and friends."  His sister Nancy described him as an " 'ugly person,' " a "violent alcoholic," a "ruthless man" who was "selfish and manipulative," and a person who "if you crossed him he would retaliate physically."  According to his brother Carlos, Adam Sr. "had always been the black sheep of the family" and was "physically and verbally abusive to his wife and children."  His brother Gilbert "explained that Adam Sr. destroyed this family with his anger, drug dealings, alcoholism, and physical abuse."  The trial court could reasonably conclude that Adam Sr.'s reputation was already so poor that he could not tarnish it further in the days remaining to him following his conversation with Gisela.  "If the declarant has reason to believe that an ostensibly damaging

---

[6]     As defendant notes, the hearsay exception for dying declarations under Evidence Code section 1242 is not at issue here since the statement was not made "regarding the cause and circumstances of [the declarant's] death."

18

statement will have no adverse consequence, the rationale for the exception fails and the statement should be excluded." (*People v. Gordon* (1990) 50 Cal.3d 1223, 1281 (concurring opinion of Kennard, J.).) Finally, as the trial court observed, there was a risk that Adam Sr. was implicating himself in Rodarte's murder simply to aid his son, knowing he was beyond any punishment this side of the grave. (*People v. Frierson, supra,* 53 Cal.3d at p. 745 ["The court could reasonably find White wanted to aid his friend at little risk to himself, and thus the statement was insufficiently trustworthy"].) On this record, we cannot say the trial court abused its discretion in declining to admit statements attributed to Adam Sr. on his deathbed.

## DISPOSITION

The order dated November 1, 2023, denying defendant's motion to vacate his conviction, is affirmed.[7]


RICHARDSON, J.

We concur:


LUI, P. J.


CHAVEZ, J.

---

[7] Defendant also asks that we "clarify that there is no statutory bar to filing a second motion to vacate due to newly discovered evidence pursuant to section [1473.7]," should new evidence be discovered. Under certain circumstances, a defendant may be collaterally estopped from filing a second petition for relief under section 1473.7. (*People v. DeMontoya* (2022) 85 Cal.App.5th 1159, 1181-1182.) It is not our function to render an advisory opinion on this issue. (*Coleman v. Department of Personnel Administration* (1991) 52 Cal.3d 1102, 1126.) Whether defendant is collaterally estopped from filing a successive petition is left, in the first instance, to the trial court in which that petition is filed, if and when defendant discovers new evidence.